IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

JENNIFER MOSCHETTI             )
                                        )
          Plaintiff,            )
                                          )
v.                                 )   Civil Action No.: 3:22cv24
                                        )
OFFICE OF THE INSPECTOR GENERAL, *et al.*   )
                                        )
          Defendants.        )

## FIRST AMENDED COMPLAINT

Jennifer Moschetti, by counsel, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, states as follows as her First Amended Complaint against the following defendants: the Office of the Inspector General ("OSIG"), the Commonwealth of Virginia, Michael C. Westfall, the State Inspector General, Kate Hourin, OSIG's Communications Director, Brian Moran, the former Secretary of Public Safety and Homeland Security for Virginia, and Clark Mercer, the former Chief of Staff for former Governor Ralph Northam.

### NATURE OF ACTION

1.     This case is about protecting whistleblowers. When Jennifer Moschetti, then the lead investigator for OSIG's investigation into the Virginia Parole Board (the "Board"), submitted a detailed 14-page draft report setting forth numerous examples of alleged violations of policy and law by the Board, she could never have imagined that, just nine months later, she would become the scapegoat for having shined a light on Board misconduct. But that's exactly what happened. After she submitted her draft report, it was sanitized, reduced, redacted, and then released, but only in redacted form. When the media finally obtained Moschetti's initial report, which contained far more details about alleged Board misconduct than the sanitized final version, she was investigated,

fired, and defamed. She now files this lawsuit for numerous violations of federal and state law in order to vindicate her rights and to restore her good name.

### JURISDICTION AND VENUE

2.      This Court has federal subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331. It has pendent and supplemental jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claims occurred.

### PARTIES

4.      Moschetti is a resident of Virginia and a former employee of the Commonwealth of Virginia, specifically at OSIG.

5.      The Office of the State Inspector General is an agency of the Commonwealth of Virginia that is located in the City of Richmond, Virginia. OSIG and the Commonwealth (the "Commonwealth Defendants") are collectively an "employer" under Va. Code § 40.1-27.3,

6.      Westfall is, and at all relevant times herein has been, the State Inspector General for OSIG.  He is sued in his individual capacity. He also is an "employer" under Va. Code § 2.2-3010 of the Virginia Fraud and Abuse Whistle Blower Protection Act (the "Virginia Whistle Blower Act").

7.      Hourin is, and at all relevant times herein has been,  the Communications Director for OSIG.  She is sued in her individual capacity.

8.      Moran is the former Secretary of Public Safety and Homeland Security for the Commonwealth of Virginia.  He is sued in his individual capacity.

9.      Mercer is the former Chief of Staff for the former Governor of Virginia, Ralph Northam.  He is sued in his individual capacity.

## FACTS

### A.      BACKGROUND

10.      Moschetti worked as an investigator for OSIG from January 2020 through March 22, 2021.

11.      Even though her period of employment was brief,  Moschetti was well-regarded at OSIG. She received a "Major Contributor" performance rating in her annual evaluation, and in that same document, was called a "person of integrity," a "detail-oriented investigator," a "valued member of the Hotline team," and someone whose "work is far superior to her time at OSIG would suggest." Moschetti's evaluation also stated that she "*is consistently fair and balanced* when interacting with external 'customers.'" (emphasis added).

### B.      THE PAROLE BOARD INVESTIGATION

12.      On May 4, 2020, Westfall assigned Moschetti to investigate multiple complaints of fraud and abuse involving the Board.

13.      Moschetti then faithfully investigated such allegations – conducting numerous interviews, reviewing numerous documents, and evaluating policies, regulations and statutes -- and completed several detailed reports. In her annual evaluation, OSIG specifically praised Moschetti for her work on the Board investigation, stating her reports were "comprehensive and exhaustive," her work was "meticulous," and her "final reports [were] of the highest quality."

14.      At all times during the Board investigation, Westfall supervised and collaborated with Moschetti.  ***At no time*** did Westfall, or anyone else at OSIG, indicate, directly or indirectly, to Moschetti that her investigation into the Parole was biased, agenda-driven, or otherwise lacking in

objectivity. To the contrary, all of Moschetti's protocols and plans for her investigation – including her proposed witness interview questions – were approved by OSIG.

      15.    Westfall certified as "substantiated" Moschetti's findings of numerous violations of policy and law by members of the Board related to the Board's decision to grant parole to the following offenders (names redacted) DLB, IC, RDG, TXG, DMR, PS, and DKS.

      16.    Westfall further certified as "substantiated" Moschetti's findings of violations of policy and law by members of the Board in granting the parole of an additional offender: VLM. These findings were detailed as an executive summarized 10-page report. That report was submitted by Westfall to the Office of the Attorney General where it was then redacted and reduced to a six-page report.

**C.    THE LEAK OF THE VLM REPORT AND BACKLASH FROM THE GOVERNOR'S OFFICE**

      17.    The final report on VLM was submitted to various persons, including Mercer, on or about July 28, 2020. Soon thereafter, however, an unredacted version of the VLM report was leaked to the public, prompting numerous news stories about the report.

      18.    On August 14, 2020, shortly after the leak of the six-page VLM report, Moschetti and Westfall were summoned to the Office of the Governor, where they both were interrogated by various members of the Northam administration regarding her reports, investigations, and findings. At that meeting were Clark Mercer, Brian Moran, Secretary of Public Safety and Homeland Security, Westfall, and others, including Nicky Zamostny.

      19.    For over an hour, Moschetti and Westfall were hostilely cross-examined about the findings contained in the VLM report. Notably, Moran openly questioned whether OSIG even had the authority to investigate the Board, stating, in relevant part, "So you think [state law] gives you

the ability to review any agency's policies, and whether or not they're following it?"[1] When Westfall answered affirmatively, Moran then scoffed at his response, stating "Really?  Wow."

20.     Moran then turned to the substance of the VLM report.  Looking directly at Moschetti, he said: "Jennifer, I guess _you're the one that wrote this_?"  Westfall immediately took the focus off of Moschetti and said he would address any concerns with the report.

21.     Westfall's gesture, however, did nothing to lessen the attacks by Moran, Mercer, and Zamostny.  Among other things, the three individuals repeatedly complained about the negative (but true) background information about VLM that was included in the report.  Instead, they said, the report _should have_ included all of the allegedly good things that VLM had done since he had been incarcerated.  Indeed, at one point, Mercer said there were "dozens and dozens of pages" in VLM's file showing that he had a "sparkling" reputation within the Virginia corrections system. He said that this _positive_ information is what had actually led the Board to grant parole to VLM, and, thus, it should have been included.

22.     Zamostny went even further, saying "I'm just going to put this out there . . the fact that this is the _way_ it [the report] was written also speaks to the _way_ that it was investigated and brings into question for me whether you were all were _objective and unbiased_ in your report." (emphasis added). She continued:  "I think that this is prejudicial, and it sets the tone for the rest of the report."

23.     Westfall pushed back, saying the VLM report had been vetted by OSIG's counsel (i.e., its representative from the Virginia Attorney General's office) and that counsel had approved the inclusion of all of the information in the Report.

---

[1]     https://richmond.com/news/state-and-regional/audio-exclusive-in-closed-door-meeting-governors-office-ripped-inspector-generals-parole-board-investigation-as/article_0cef39cf-8945-5c9a-b403-c3d0965994c3.html (viewed on January 13, 2022).

24.     Moran did not appear to be satisfied with this answer.  To the contrary, he said he could not believe the report had been written as it had been knowing that it might get to the press. He complained that Westfall should have known what a "disserve it would be on the Board *and us*" (emphasis added) for the OSIG to write the report the way it did.  Moran said:  **"I don't know how you can defend that, Mike**."

25.     Moran also disputed OSIG's findings in the VLM report, stating "I don't think they've violated any policies, and this thing is entirely prejudicial."

26.     During the meeting, Moschetti announced to those in attendance that a more comprehensive report regarding VLM existed; however, Westfall refused to release the longer report that he had previously approved report to the administration.

**D.     MOSCHETTI'S REASONABLE CONCERNS ABOUT WRONGDOING**

27.     The August 14, 2020 meeting was intended to intimidate – and *__did__* intimidate -- Westfall and the OSIG investigators who were tasked with making fact findings related to members of the Board.  Indeed, under questioning from the Governor's team, Westfall actually promised that OSIG would *not* look into any new complaints about the Board, but instead, would forward them to the Governor's Office.

28.     As well, following the meeting, Westfall spoke to Moschetti and explained that he might lose his job for the work product regarding the VLM investigation. This apprehension by her supervisor placed Moschetti in substantial fear of losing her job as the primary investigator on the Board matter.

29.     Indeed, Moschetti had long been apprehensive about both her livelihood -- and even her safety -- due to her work on the Board investigations – especially her VLM report.

30.     She became particularly concerned after her June 15, 2020 draft of the VLM report was sanitized and shortened as the result of certain discussions between OSIG and its Agency representative from the Office of the Attorney General.

31.     Among the key items removed from Moschetti's June 15, 2020 draft report were her discussions of potential criminal wrongdoing by the Board and various details showing that the then-Board Chair, in deciding whether to grant VLM parole, had gone beyond the simple question of whether parole was justified and, instead, had delved into whether VLM had actually committed the crime for which he was convicted. For example, Moschetti's draft said: "During interviews with VPB employees, Bennett often verbally stated that she believed Martin was innocent and employees felt that this belief was the main deciding factor of his release."[2]  This detail, of course, not only showed the use of improper considerations in parole decisions, it also cast doubt as to whether VLM's good behavior while incarcerated was the main reason for his grant of parole.

32.     These actions and others caused Moschetti to be worried that OSIG, the Attorney General's Office, the Governor's Office, or some combination of all three, were trying to cover up the serious of the allegations against the Board.  She was also concerned that these governmental entities might even be engaging in improper conduct themselves by sanitizing her reports and leaving out important details.

33.     Moschetti's concerns and apprehensions during this time were reasonable. As early as May 8, 2020 (i.e., the very beginning of Moschetti's investigation), the Governor's Office, through Mercer, reached out to Westfall to inquire about the status of the investigation and whether any preliminary results had been reached. The Board too was resistant to OSIG's investigation of

---

[2] https://apnews.com/article/richmond-virginia-027a0ca4c989fb2aedf8b2e9f0516640 (visited on May 6, 2022).

it, specifically asking OSIG in May 2020 to identify the legal basis upon which it claimed to have the authority to conduct its investigation.

E.    **MOSCHETTI'S RESPONSE TO HER CONCERNS ABOUT WRONGDOING**

34.    Because of her apprehensions, which existed throughout the entire summer and fall of 2020, Moschetti decided to speak out.  First, she spoke with a former law enforcement officer about the VLM report.  She also provided him with copies of some of her Board reports, including the draft of her VLM report. At the time, Moschetti told the former law enforcement official "In case I get 'Epsteined,' here's the truth."[3]

35.    Around the same time, Moschetti also provided a copy of the draft VLM report to an active law enforcement officer with the City of Richmond Police Department ("RPD").  In doing so, she again reiterated her safety concerns.  In her text message to the officer, Moschetti wrote "In case I get 'Epsteined,' here's the truth.

36.    At no time did Moschetti tell either the former law enforcement official or the RPD law enforcement official to make any of the reports public or to distribute them to the media.  She provided the information to these individuals, however, because she want to let someone with law enforcement connections know that there were far more details about the Board's decision to grant parole to VLM – a decision which was at odds with its own prior decisions (at least 20 of them) **and** the recent recommendation of the parole examiner who interviewed VLM right before the Board's 2020 favorable decision – and that the Board's actions as to other offenders had violated law and policy.

---

[3] "Epsteined" is a reference to the disgraced financier Jeffrey Epstein, who was found unresponsive in his federal jail cell on August 10, 2019 (and later declared dead) and whose untimely death has been the subject of rumors and conspiracy theories.  https://www.foxnews.com/us/jeffrey-epstein-death-suicide-murder (visited on January 13, 2022).

37.     Moschetti also shared some of the information from her Board reports with the FBI, again, after seeing how things had been handled with the VLM report, out of concern that wrongdoing by the Board was likely to be covered up by OSIG and/or the Governor's Office.

F.     **THE FEBRUARY DISCLOSURE OF BOARD REPORTS**

38.     In February 2021, the full 14-page VLM report from June 15, 2020 was leaked to the media. As noted above, the 14-page report was an earlier draft of Moschetti's work product.

39.     The VLM report contained substantial facts and findings of serious wrongdoing by members of the Board that had been previously omitted at the direction of the Office of the Attorney General.

40.     The VLM report also contained key facts about the mindset of the then-Board chair. The report, for example, said the then-Chair had said the case against VLM was "built on lies" and had tried to marshal support of his release.[4]   The report also said that the the-Chair had said the Board "unfortunately had no choice" but to contact the victims.

41.     Moschetti did not leak the VLM report – or any other reports or work product – to the media, either at that time or at any other time.

G.     **MOSCHETTI BECOMES THE SCAPEGOAT FOR HER WHISTLEBLOWING ACTIONS**

42.     Following the leak of the 14-page report and other documents, Westfall publicly announced that the Virginia State Police would be conducting an investigation into person who leaked the documents.

43.     Westfall himself also came under intense scrutiny and pressure from the Governor's office about why such important reports were never presented to the Governor.  In a February 26,

---

[4]     https://www.virginiamercury.com/2021/02/26/the-laws-did-not-matter-leaked-reports-show-pattern-of-parole-board-violations/ (visited on January 13, 2020).

2021 letter to him from Rita Davis, then Counsel to the Governor, Ms. Davis pulled no punches about the reports:

> ***It cannot be stated strongly enough how important these reports are.*** Media reports claim that draft reports prepared by the OSIG ***allege criminal conduct by past and current members of the Virginia Parole Board***. ***Allegations of such criminal conduct are extremely serious and troubling***. Such allegations are especially troubling since they were never presented to the Office of the Governor. In order to consider appropriate action, it is imperative that the Office of the Governor obtain copies of these draft reports immediately.

(Emphasis added).

44. Since she had already cooperated with Federal Law Enforcement, since she was the author of the report that was leaked, since she *knew* that the more detailed report had been shortened by OSIG to remove important facts and details, and since she had disclosed copies of some of her reports to a former law enforcement official and a current law enforcement officer, Moschetti now feared she was going to be used as a scapegoat for the controversy surrounding the Board's conduct. She was especially concerned that she would be retaliated against because of the previous hostile in-person meeting with senior leadership of the Northam administration and Westfall's comments that he believed he was also going to be fired as a result of the investigation of the Board.

45. On Wednesday, March 3, 2021, Moschetti released a partial copy of her file to leadership of the General Assembly, which is defined as an Appropriate Authority under the Virginia Whistle Blower Act and identified herself anonymously through her counsel as a Whistle Blower. The release contained the full reports of DLB, IC, RDG, TXG, DMR, PS, DKS and VLM, as well as other facts and circumstances detailing additional violations by the Board.

46. On Friday, March 5, 2021, Moschetti received a home visit by Katrina Goodman, Chief of Investigations and Rich Scholl, Investigations Manager, both employed by OSIG, who hand-delivered a letter authored by Corrine Louden placing the Moschetti on pre-disciplinary leave

with pay pending an investigation into alleged misconduct. Her work laptop was seized at that time, as was her employee access card.

47.     On March 5, 2021, Moschetti, through her then counsel, sent a letter to Westfall and Deputy Inspector General Louden unmasking herself as a Whistle Blower and demanding retraction of the threat of "pre-disciplinary" leave for "alleged misconduct."

48.     Then, on March 8, 2021, Moschetti filed a Petition For Declaratory Judgment and Mandamus in the City of Richmond Circuit Court asking the Court to declare her a Whistle Blower under the Virginia Whistle Blower Protection Act and to award her various forms of relief.

49.     Notwithstanding her disclosures to the FBI, to a former law enforcement official, to a current RPD law enforcement officer, and to the General Assembly and notwithstanding the filing of her Petition, Moschetti was fired by OSIG on March 22, 2021.

**H.     MOSCHETTI ALSO BECOMES A PUBLIC TARGET FOR DISPARAGING REMARKS, BOTH BY THE GOVERNOR'S OFFICE AND OSIG**

50.     Even beyond losing her job because of her whistleblowing activities, Moschetti also became "Public Enemy Number 1" for the then-Governor's Office and even a target of OSIG when it came to publicly addressing the Board crisis.

51.     In a news conference on March 9, 2021, the day right after Moschetti filed her Whistle Blower Petition, Mercer openly disparaged her when talking about the August 14, 2020 meeting.  He said "We went into that meeting ***thinking*** that there was bias and there was lack of objectivity,"  and "We left that meeting ***knowing*** that there was ***bias and a lack of objectivity in that report***." (the July 28, 2020 report).

52.     At the same press conference, Mercer also specifically disparaged Moschetti's legal petition, saying her whistleblower claims were "a political ploy to hurt the Northam administration and other state leaders."

11

53.     Likewise, in a radio interview that occurred on or about March 9th or 10th, 2020, Moran echoed Mercer's "bias" allegations, stating that Moschetti's report was "biased" and that she would not hold up under "cross examination."

54.     Finally, even though OSIG has a longstanding policy in place of not commenting on ongoing, potential, or possible investigations (which, of course, includes investigations of its own employees), it eschewed that policy when asked to comment on Moschetti's termination. Specifically, OSIG, through its spokesperson, Hourin, stated:

> The Office of the State Inspector General (OSIG) models ***integrity, trust and ethical behavior*** and demonstrates the ***highest standards of honestly, respect and accountability.***

(emphasis added).[5]

55.     The Agency also said at that time that: "For privacy reasons, OSIG cannot comment on personnel matters." *Id.*  However, it had obviously done just that.

56.     None of the above statements or their negative implications are true. Unlike Mercer's and Moran's false accusations, Moschetti did ***not*** conduct her investigation or draft any of her reports with bias or a lack of objectivity.  Indeed, everything she wrote – even the leaked reports – was vetted by Westfall and others, and her entire plan of investigation -- every step -- was vetted and approved by OSIG.  Moschetti had no hidden (or open) agenda as to her investigation; she had no pre-conceived notions about any members of the Board, and she had no personal opinions one way or the other about whether any of the offenders at issue were guilty of the crimes for which they were convicted or whether they should or should not have been granted

---

[5] https://www.wric.com/news/virginia-news/state-investigator-fired-after-seeking-whistleblower-status-attorney-says/ (visited on January 13, 2022).

parole.

57.     Nor did Moschetti file her Petition for whistle blower relief as a "political ploy" to hurt the Governor or his administration. Indeed, Mercer's comment in this regard might be one of the most ridiculous statements anyone has ever said about Moschetti.  To be clear: Moschetti filed her Petition because she was, in fact, seeking legal whistleblower protections.  Nothing more. Nothing less.

58.     Finally, OSIG's statement above implies that Moschetti lacked integrity, trust, honesty, respect, and ethical behavior when she conducted her Board investigations.  This is not true.  Rather, at all times, she was fair, ethical, honest, respectful, accountable, and trusting when she investigated the Board and when she reached her conclusions about its conduct.

## I.     AFTERMATH

59.     Since the date of her unlawful termination, Moschetti has been unable to find suitable replacement employment.  Although she did file a state grievance as to her termination, the proceedings were futile and improperly truncated.  Among other things: (i) the grievance was expressly limited, over Moschetti's objections, only to her whistleblowing conduct in February and/or March 2021; it did not include her whistleblowing conduct in the summer and fall of 2020; and (ii) she was not allowed to call, despite her requests to do so, several important witnesses in her case, including, but not limited to, Mercer, Moran, Zamostny, and Mike Jagels, the attorney assigned to OSIG by the Office of the Attorney General.

### COUNT I:
### DUE PROCESS VIOLATION: LIBERTY INTEREST
### (AGAINST WESTFALL AND HOURIN)

60.     The allegations of paragraphs 1-59 are realleged as if fully set forth herein.

61.     Under the Fourteenth Amendment, Moschetti has a liberty interest to engage in the commonplace occupations of her life and with respect to her good name, reputation, honor, and integrity.

62.     Here, Hourin and Westfall, both of whom are agents of a governmental body acting under color of state law, violated Moschetti's liberty interests by falsely indicating (in paragraph 54 of the Complaint), in conjunction with her termination, that Moschetti had, among other things, acted without integrity, honesty, respect, trust, or accountability, in conducting her investigation of the Board and drafting her reports about Board misconduct. Hourin released the statement under her name and the statement was approved by Westfall, who reviewed it and vetted it before it was released to the public.

63.     These false accusations impugn Moschetti's good name, honor, reputation, and integrity, thus causing a stigma to her reputation, and were made in connection with her termination of employment at OSIG.

64.     Additionally, the false statements at issue were made public to, among others, local media outlets.

65.     Further, Hourin's actions, which were approved by Westfall, who reviewed and vetted her public statement, are attributable to the Commonwealth Defendants because her comments were made in her capacity of a de facto policymaker at OSIG.

66.     As a direct result of the actions of the defendants named in this Count, in violation of the rights secured to her under 42 U.S.C. § 1983 ("Section 1983"), Moschetti has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith.  Additionally, Moschetti has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of their actions.

14

67.     Further, Hourin's and Westfall's actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Moschetti's rights, thus entitling her to punitive damages.

68.     Finally, Hourin's negative public comments irreparably poisoned public perception about Moschetti to such a degree that any type of name-clearing hearing or post-deprivation remedy would have been futile or worthless.  And, indeed, the only hearing she has obtained so far, her state grievance hearing, was woefully inadequate and did not provide her with a full and fair ability to vindicate her rights.

## COUNT II:
### FIRST AMENDMENT RETALIATION
### (AGAINST WESTFALL)

69.     The allegations of paragraphs 1-68 are realleged as if fully set forth herein.

70.     Moschetti engaged protected activities under Section 1983 (through the Fourteenth Amendment of the Constitution) when she exercised her rights under the First Amendment of the Constitution (i) to speak to the FBI about the Board and her investigation thereof (and to disclose some of her materials to the FBI); (ii) to speak to an active RPD law enforcement official about the Board and her VLM draft report (and to disclose the draft report to this individual); (iii) to speak to a former law enforcement official about the Board and her investigation thereof (and to disclose some of her report materials); (iv) to disclose some of her report materials to members of the General Assembly on or about March 3, 2021; and (v) to file her Petition seeking Whistle Blower status.

71.     Westfall was aware of Moschetti's protected activities and/or believed that Moschetti had engaged in such protected activities, and was aware that any retaliation based on such protected activities would violate Moschetti's rights under clearly established law.

72.     Notwithstanding this awareness, Westfall violated Moschetti's rights under the First Amendment when he terminated her based on her protected activities – that is, they terminated her, in whole or in part, (i) because she disclosed materials and information to a current RPD law enforcement official, a former law enforcement official and to the FBI, (ii) because she disclosed materials to the General Assembly, and (iii) because she filed her Petition seeking Whistle Blower status.

73.     Westfall acted with malicious intent to deprive Moschetti of her First Amendment rights, as secured under Section 1983, and to do her injury.

74.     As a direct result of the actions of Westfall, in violation of the rights secured to Moschetti under Section 1983, Moschetti has been caused to suffer the loss of work, income, and the benefits and compensation associated therewith. Additionally, Moschetti has been caused to suffer personal injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of the Defendants' actions.

75.     Further, Westfall's actions constitute gross, wanton, malicious, reckless and/or intentional violations of Moschetti's rights, thus entitling her to punitive damages.

## COUNT III:
### WRONGFUL TERMINATION UNDER VIRGINIA CODE § 2.2-3011
### (AGAINST DEFENDANT WESTFALL)

76.     The allegations of paragraphs 1-75 are realleged as if fully set forth herein.

77.     Moschetti has been subjected to retaliatory actions for conduct as a whistle blower which is protected under Virginia Code § 2.2-3011.

78.     Virginia Code §2.2-3011(A) states: "No employer may ***discharge***, threaten, or otherwise discriminate or retaliate against a whistle blower whether acting on his own or through a person acting on his behalf or under his direction." (emphasis added).

79.   Moschetti has, in good faith, cooperated with Federal Law Enforcement and provided materials to a current and former local law enforcement official.

80.   Moschetti has, in good faith, reported alleged misconduct by Westfall evidencing his failure to publish additional violations of the Board to Appropriate Authorities, including the leadership of the Virginia General Assembly.

81.   Moschetti has, in good faith, reported alleged misconduct of the Office of the Attorney General in redacting substantial sustained facts and circumstances of the VLM report to conceal the findings of the State Inspector General from other members of the Northam Administration to Appropriate Authorities, including the leadership of the Virginia General Assembly.

82.   Moschetti has, in good faith, reported alleged misconduct of the Office of Public Safety and Homeland Security and the Office of the Governor for failing to take actions to correct the wrongdoing of the Board to an Appropriate Authorities, including the leadership of the Virginia General Assembly.

83.   Moschetti has neither communicated with the media nor released any information, documents or otherwise to the media at any time.

84.   Westfall has been on notice that Moschetti is a protected whistle blower, protected by applicable provisions of the Virginia Code, and terminated her in violation of this law.

**COUNT IV:**
*BOWMAN*[6] **CLAIM**
**(AGAINST WESTFALL)**

85.   The allegations of paragraphs 1-84 are realleged as if fully set forth herein.

---

[6] *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985).

86.     Here, based on the facts alleged herein, Westfall wrongfully terminated Moschetti in violation of the public policies of Virginia.

87.     Such policies are found in many places in the Virginia Code, including but not limited to: (i) Va. Code § 53.1-136(2); (ii) § 53.1-55(B); (iii) Va. Code § 53.1-139(1); (iv) Va. Code § 53.1-154; (v) Va. Code § 2.2-309; (vi) Va. Code § 2.2-313; (vii) Va. Code § 40.1-27.3; and (viii) Va. Code § 2.2-3011.

88.     As a proximate cause of the conduct of Westfall, Moschetti has suffered substantial compensatory damages, including mental and emotional distress, reputational harm, loss of sleep, loss of income, humiliation, embarrassment, loss of time, and other damages.

89.     In addition, Westfall acted intentionally, willfully, maliciously, out of personal spite and ill will against Moschetti, and with utter and conscious disregard of her rights, Moschetti is also entitled to punitive damages in this matter.

## COUNT V:
### WRONGFUL TERMINATION UNDER VIRGINIA CODE § 40.1-27.3
### (AGAINST DEFENDANT OSIG, THE COMMONWEALTH, & WESTFALL)

90.     The allegations of paragraphs 1-89 are realleged as if fully set forth herein.

91.     Here, Moschetti's termination is a violation of Va. Code § 40.1-27.3.  Under this law, an employer shall not discharge an employee because the employee "in good faith reports a violation of any federal or state law or regulation to. . . any governmental body or law-enforcement official" Va. Code § 40.1-27.3(A)(1).

92.     Here, Westfall, OSIG, and the Commonwealth violated this law because they terminated Moschetti because she, in good faith, reported violations of state law and regulations to the FBI, to an active law enforcement official, and to the General Assembly.

93.     As a proximate cause of the misconduct by the defendants named in this Count, Moschetti has suffered substantial compensatory damages, including as severe mental and emotional distress, reputational harm, loss of sleep, loss of income, humiliation, embarrassment, loss of time, and other damages.

94.     In addition, Defendants' actions were made intentionally, willfully, and maliciously against Moschetti and with utter and conscious disregard of her rights.  Moschetti is also entitled to punitive damages in this matter.

### COUNT VI – DEFAMATION:
### (AGAINST WESTFALL, HOURIN, MERCER, & MORAN)

95.     The allegations of paragraphs 1-94 are realleged as if fully set forth herein.

96.     Moschetti has been defamed by the statements of Hourin (as approved by Westfall), Mercer, and Moran that are specifically referenced and previously set forth in paragraphs 51-54 of the First Amended Complaint, which statements were published and were made with the intent to defame Moschetti.

97.     In particular, Mercer defamed Moschetti through the comments identified in paragraphs 51 and 52 herein; Moran defamed Moschetti through the comments identified in paragraph 53 herein; and Westfall and Hourin defamed Moschetti through the comments identified in paragraph 54 herein.

98.     The statements at issue are false and purport to be statements of fact, not statements of opinion.

99.     Moreover, the false statements all involve the efforts of the defendants named in this Count to demean and disparage Moschetti and to falsely accuse her of unprofessional occupational activities and unfitness to perform the duties of her job, and thus these statements constitute defamation *per se*.

19

100.    As a proximate cause of the conduct of the defendants named in this Count, Moschetti has suffered substantial compensatory damages, including as severe mental and emotional distress, reputational harm, loss of sleep, loss of income, humiliation, embarrassment, loss of time, and other damages.

101.    In addition, the statements by the defendants named in this Count were made intentionally, willfully, and maliciously against Moschetti and with utter and conscious disregard of her rights.

102.    Finally, no privileges, qualified or absolute, attach to these statements, therefore, and Moschetti is also entitled to punitive damages in this matter.  Indeed, Moran and Mercer's comments were motivated by political considerations and had nothing to do with any sincere or genuine beliefs that what they were saying was true.  Likewise, Hourin and Westfall's statements were motivated by self-preservation and protecting their own images and jobs, rather than expressing a sincere belief about Moschetti.

WHEREFORE, Plaintiff requests this Honorable Court to:

    a.   Accept jurisdiction of this case;

    b.   Award Plaintiff compensation for her loss of wages and other benefits, including back pay and all fringe benefits to which she would have been entitled had her employment with OSIG not been unlawfully terminated. Such damages shall be in an amount in excess of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000), the exact amount to be determined at trial;

    c.   Award Plaintiff front pay for her future loss of pay. Such amount shall be in excess of SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000), the exact amount to be determined at trial by jury or post trial by the Court;

    d.   Award Plaintiff compensatory damages for humiliation, mental and emotional distress, and pain and suffering that she has experienced and endured as a result of the unlawful actions of the Company towards her.  Such damages shall be in an amount not to exceed TEN MILLION DOLLARS ($10,000,000.00), the exact amount to be determined at trial;

    e.   Award Plaintiff punitive damages against the individual defendants named in this Complaint in an amount not to exceed THREE HUNDRED FIFTY THOUSAND DOLLARS ($350,000.00), the exact amount to be determined at trial;

    f.   Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

    g.   Grant Plaintiff her reasonable expenses, costs and attorneys' fees; and

    h.   Grant such other and further relief as to the Court seems just and proper.

**A TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,

JENNIFER MOSCHETTI

By:    /s/Richard F. Hawkins, III
Richard F. Hawkins, III, VSB# 40666
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 232220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)
Email: rhawkins@thehawkinslawfirm.net

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of May, 2022, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF systems which will send notification of such filing to

the following:

Jimmy F. Robinson, Jr.
Scott A. Siegner
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Riverfront Plaza - West Tower
901 East Byrd Street, Suite 1300
Richmond, VA 23219

Counsel of record for Defendants

                            s/ Richard F. Hawkins, III
                            Virginia Bar Number: 40666
                            THE HAWKINS LAW FIRM, PC
                            2222 Monument Avenue
                            Richmond, Virginia 23220
                            (804) 308-3040 (telephone)
                            (804) 308-3132 (facsimile)
                            Email: rhawkins@thehawkinslawfirm.net

                            Counsel for Plaintiff