## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

JENNIFER MOSCHETTI,                    )
                            )
        Plaintiff,            )
                            )
v.                                     )      Civil Action No. 3:22-cv-24–HEH
                            )
OFFICE OF THE INSPECTOR                )
GENERAL, *et al.*,                     )
                            )
        Defendants.           )

### <u>MEMORANDUM OPINION</u>
### (Granting and Denying Motion to Dismiss in Part;
### Denying Motion to Strike as Moot)

Plaintiff Jennifer Moschetti ("Plaintiff" or "Moschetti") worked as an investigator for the Office of the Inspector General ("OSIG"), a state agency of the Commonwealth of Virginia (the "Commonwealth"). (Am. Compl. ¶ 10, ECF No. 16.) In March 2021, OSIG terminated Moschetti's employment. (*Id.* ¶ 49.) Moschetti now brings this lawsuit claiming that OSIG violated various state statutes and the United States Constitution when it terminated her. Moschetti also claims that her superiors at OSIG and other state officials defamed her when they spoke publicly about her around the time that she was terminated.

Currently before the Court is Defendants' Motion to Dismiss (the "Motion") filed on May 20, 2022.[1] (ECF No. 18.) In the Motion, Defendants argue that Moschetti's six

---

[1] Defendants include (1) OSIG, (2) the Commonwealth, (3) Michael Westfall, the State Inspector General, (4) Kate Hourin, OSIG's Communications Director, (5) Brian Moran, the former Secretary of Public Safety and Homeland Security of Virginia, and (6) Clark Mercer, the former

claims should be dismissed for failure to state a claim, on qualified immunity grounds, and for various other reasons. (Mot. at 1, ECF No. 18.)  The parties have submitted memoranda in support of their respective positions.  On July 20, 2022, the Court heard oral argument on the issues, and the Motion is now ripe for review.  For the reasons stated herein, the Court will grant the Motion as to Counts I, IV, and V and deny the Motion as to Counts II and III.  On Count VI, the Court will grant the Motion as to Hourin and Westfall, deny it as to Moran, and partially deny and partially grant it as to Mercer.[2]

## I.    STANDARD OF REVIEW

Defendants' Motion is premised on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Mot. at 1.)  A motion made pursuant to Rule 12(b)(1) challenges the Court's jurisdiction over the subject matter of a complaint.  Such a challenge can be facial, asserting that the facts as pled fail to establish jurisdiction, or factual, disputing the pleadings themselves and arguing that other facts demonstrate that no jurisdiction exists. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).  For a facial challenge, "the plaintiff is 'afforded the same procedural protection as she would receive under a Rule 12(b)(6) consideration.'"

---

Chief of Staff for Governor Ralph Northam (collectively "Defendants"). (Am. Compl. at 1.)

[2] On June 17, 2022, Plaintiff filed a Motion to Strike Exhibit 1 attached to Defendants' Reply to the Motion to Dismiss. (ECF No. 25.)  Because the Court decides the Motion to Dismiss in this opinion, the Motion to Strike is now irrelevant and will be denied as moot.  However, the Court notes that it did not consider Exhibit 1 of Defendants' Reply when deciding the Motion to Dismiss.

*Id.* In the Motion, Defendants make a facial challenge in all but one instance.[3] (Defs.'
Reply at 6–7, ECF No. 24.) Thus, the Rule 12(b)(6) standard of review applies to the
portions of their Motion premised under Rule 12(b)(1) as well. *See Beck*, 848 F.3d at
270.

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of
a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir.
2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).
"A complaint need only 'give the defendant fair notice of what the . . . claim is and the
grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020)
(alteration in original) (quoting *Tobey*, 706 F.3d at 387). However, a "complaint must
provide 'sufficient factual matter, accepted as true, to state a claim to relief that is
plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Allegations have facial plausibility 'when
the plaintiff pleads factual content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting
*Iqbal*, 556 U.S. at 679). A court, however, "need not accept legal conclusions couched as
facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930
F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).
In considering such a motion, a plaintiff's well-pleaded allegations are taken as true, and

---

[3] Defendants' argument that Count III is barred by *res judicata* requires the Court to consider
outside information and is thus factual. *See Beck*, 848 F.3d at 270. Therefore, on that portion of
the Motion, the Court will consider outside facts presented by both parties. *See Kerns*, 585 F.3d
at 192.

3

the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

While a motion to dismiss tests the sufficiency of a complaint, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citations omitted). A court may consider a document not attached to the complaint, when "the document [is] integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached, . . . the exhibit prevails." *Id.* (alteration in original) (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

## II.   BACKGROUND

Moschetti worked as an investigator at OSIG from January 2020 until March 22, 2021. (Am. Compl. ¶ 10.) At all relevant times, Michael Westfall, the State Inspector General ("Westfall"), supervised Moschetti. (*Id.* ¶¶ 6, 14.) On May 4, 2020, Westfall instructed Moschetti to begin an investigation into fraud and abuse allegations within the Virginia Parole Board (the "Parole Board"). (*Id.* ¶ 12.) Over the next few months, Moschetti investigated the Parole Board by conducting interviews, reviewing documents, and evaluating applicable law. (*Id.* ¶¶ 13–14.)

Based on her investigation, she prepared reports detailing the Parole Board's

4

decision to grant parole to eight different inmates, including one inmate referred to as "VLM." (*Id.* ¶¶ 15–16.) In those reports, Moschetti concluded that the Parole Board had violated its own policies and certain laws. (*Id.*) Moschetti submitted these findings to Westfall who confirmed that they were "substantiated." (*Id.*) OSIG trimmed Moschetti's report on VLM down to 10 pages and submitted it to the Office of the Attorney General. (*Id.* ¶ 16.) The Office of the Attorney General further summarized and redacted the VLM report to 6 pages. (*Id.*)

On July 28, 2020, OSIG released the 6-page VLM report to "various persons" including Clark Mercer, Chief of Staff for Governor Ralph Northam ("Mercer"). (*Id.* ¶ 17.) A few days later, a copy of the 6-page VLM report was released to the public. (*Id.*) Soon after the leak, on August 14, 2020, Moschetti and Westfall met with various members of the Northam Administration including Mercer and Brian Moran, Secretary of Public Safety and Homeland Security ("Moran"). (*Id.* ¶ 18.) Moschetti alleges that Mercer and Moran "hostilely cross-examined" both Westfall and her during the private meeting, questioned the VLM report's style and conclusions, and suggested that the report was biased. (*Id.* ¶¶ 19–26.) At the meeting, Moran voiced his doubts that OSIG had the legal authority to investigate the Parole Board and questioned the neutrality of the investigators, including Moschetti. (*Id.* ¶¶ 19, 22, 24–25.) Moschetti further alleges that, at the meeting, Westfall told Mercer and Moran that any further complaints about the Parole Board would not be investigated and instead would be forwarded to the Governor's Office. (*Id.* ¶ 27.)

Because her VLM report had been shortened and redacted, and because of Mercer and Moran's conduct at the August 14 meeting, Moschetti worried that OSIG, the Attorney General's Office, or the Governor's Office may try to "cover up" the Parole Board's wrongdoing. (*Id.* ¶¶ 30–33.) Moschetti also worried that she may lose her job because of her investigation into the Parole Board. (*Id.* ¶¶ 27–29.)

Because of these concerns, at some time during the summer or fall of 2020, Moschetti decided to "speak out." (*Id.* ¶ 34.) First, she spoke to a *former* law enforcement officer and a current Richmond police officer about the investigation and shared her reports with them, including her original of the draft VLM report. (*Id.* ¶¶ 34–35.) Later, she spoke to an agent from the Federal Bureau of Investigation (the "FBI") about her Parole Board investigations. (*Id.* ¶ 37.) In February 2021, someone released the draft VLM report to the media without OSIG's permission. (*Id.* ¶ 38.) Moschetti denies leaking any information about the Parole Board directly to the media. (*Id.* ¶ 41.)

After the leak, Westfall announced that the Virginia State Police was investigating how the media obtained the draft VLM report. (*Id.* ¶ 42.) Because of the public leak and the fact that she had spoken with federal and state law enforcement, Moschetti became even more concerned that she may be "used as a scapegoat" or "would be retaliated against." (*Id.* ¶ 44.) On March 3, 2021, Moschetti released more files and reports from her Parole Board investigation to the Virginia General Assembly. (*Id.* ¶ 45.)

On March 5, 2021, OSIG placed Moschetti on pre-disciplinary leave with pay and seized her laptop and employee access card. (*Id.* ¶ 46.) The same day, Moschetti notified

6

OSIG that she had sent some documents to the Virginia General Assembly and claimed that she was a whistleblower. (*Id.* ¶ 47.) On March 8, 2021, she filed a Petition for Declaratory Judgment (the "Petition") asking a Virginia state court to declare that she was a whistleblower. (*Id.* ¶ 48.) OSIG fired Moschetti on March 22, 2021. (*Id.* ¶ 49.)

Around March 2021, the media extensively covered the Parole Board investigation and the leaked VLM report. During a March 9, 2021, news conference, Mercer allegedly defamed Moschetti by saying, "We went into that meeting *thinking* that there was bias and there was [a] lack of objectivity" and "[w]e left that meeting *knowing* that there was *bias and a lack of objectivity in that report.*"[4] (*Id.* ¶ 51 (emphasis in original).) Mercer also noted that Moschetti's Petition asking to declare her a whistleblower was a "political ploy to hurt the Northam administration and other state leaders." (*Id.* ¶ 52.) In a radio interview around the same time, Moran said that Moschetti's report was "biased" and "would not hold up under 'cross examination.'" (*Id.* ¶ 53.)

Finally, on March 22, 2021, when asked for a comment about Moschetti's termination and her Petition, Kate Hourin, OSIG's Communications Director ("Hourin"), said that OSIG "models *integrity, trust and ethical behavior* and demonstrates the *highest standards of honest[y], respect and accountability.* For privacy reasons, OSIG cannot comment on personnel matters." (*Id.* ¶¶ 54–55 (emphasis in original).)[5] Moschetti

---

[4] The "meeting" refers to the August 14, 2020, meeting with Mercer and Moran. (*Id.*)

[5] Plaintiff cites an article published online by ABC 8 News as the source of Hourin and Westfall's defamatory statement. (Am. Compl. ¶ 54 n.5); Dean Mirshahi, *State Investigator Who Looked into Va. Parole Board Fired After Seeking Whistleblower Status, Attorney Says*, ABC 8 News (Mar. 22, 2021), https://www.wric.com/news/virginia-news/state-investigator-fired-after-

alleges that all of these statements about her and her report are false and defamatory. (*Id.* ¶¶ 56–59.)

After her termination, Moschetti filed a grievance with OSIG and OSIG conducted a hearing. (*Id.* ¶ 59.) She alleges, however, that the hearing was futile because it was limited in scope and she was not allowed to call certain witnesses to testify. (*Id.*)

Based on these facts, Moschetti brings six claims in her Amended Complaint against Defendants. First, in Count I, she claims that Westfall and Hourin violated her liberty interest without due process by publicly disparaging her work performance. (*Id.* ¶¶ 60–68.) In Count II, she argues that Westfall retaliated against her for exercising her right to free speech. (*Id.* ¶¶ 69–75.) In Count III, she alleges that Westfall wrongfully terminated her in violation of Virginia Code § 2.2-3011. (*Id.* ¶¶ 76–84.) In Count IV, she alleges that Westfall wrongfully terminated her in violation of *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985). (*Id.* ¶¶ 85–89.) In Count V, she contends that OSIG, the Commonwealth, and Westfall wrongfully terminated her in violation of Virginia Code § 40.1-27.3. (*Id.* ¶¶ 90–94.) Lastly, in Count VI, she alleges that Westfall, Hourin, Mercer, and Moran defamed her by falsely claiming that she was biased, dishonest, and lacked integrity. (*Id.* ¶¶ 95–102.)

---

seeking-whistleblower-status-attorney-says/, [hereinafter ABC 8 News Article]. Because Moschetti explicitly incorporates this article into her Amended Complaint by citing it as the source of Westfall and Hourin's defamatory statement, the Court may consider the full text of the article at the motion to dismiss stage. *Goines*, 822 F.3d at 165–66.

### III.   ANALYSIS

**A.   Counts I & II: Constitutional Claims**

In Counts I and II, Moschetti claims that Defendants violated two provisions of the

United States Constitution.[6] In response, Defendants argue that Plaintiff's claims are

barred by qualified immunity or, in the alternative, Plaintiff fails to state a claim under

Rule 12(b)(6).  (Defs.' Mem. Supp. at 12–14, ECF No. 19.)  The qualified immunity

doctrine involves two steps. *Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 219

(4th Cir. 2018).  First, the Court must determine "whether the facts alleged or shown,

taken in the light most favorable to the plaintiff, establish that the officer's conduct

violated the plaintiff's constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201

(2001)).  At the motion to dismiss stage, this first step mirrors the test under Rule

12(b)(6).[7] *See Ray*, 948 F.3d at 227–228 (applying Rule 12(b)(6) standard of review as a

part of qualified immunity).  Second in the qualified immunity analysis, the Court

determines "whether the right at issue was 'clearly established' at the time of the officer's

conduct." *Id.* (citing *Saucier*, 533 U.S. at 201).

---

[6] Plaintiff brings both of her constitutional claims via 42 U.S.C. § 1983.  Section 1983 is not "a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).

[7] Plaintiff argues that the Court should not address qualified immunity at the motion to dismiss stage.  (Pl.'s Mem. Opp'n at 6–7, ECF No. 21.)  The United States Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).  Moreover, courts routinely consider a qualified immunity defense at the motion to dismiss stage. *See, e.g.*, *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305 (4th Cir. 2006) (noting that a Rule 12(b)(6) motion could appropriately raise a qualified immunity defense); *Ray*, 948 F.3d at 226–228 (noting the same).

In Count I, Moschetti alleges that Westfall and Hourin deprived her of a liberty interest without due process of law in violation of the Fourteenth Amendment. (Am. Compl. ¶¶ 60–68.) More exactly, she alleges that Westfall and Hourin publicly released the reasons for her termination and thus harmed her reputation without due process. (*Id.*) "Public employees, even when lawfully discharged, enjoy the 'freedom to take advantage of other employment opportunities.'" *Cannon v. Village of Bald Head Island, NC*, 891 F.3d 489, 501 (4th Cir. 2018) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)). Thus, the government cannot place "arbitrary restrictions" on an employee's ability to find future work. *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990). A "public announcement of reasons for an employee's discharge" can be an arbitrary restriction and, consequently, implicates a Fourteenth Amendment liberty interest. *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 645–46 (4th Cir. 2007) (quoting *Johnson*, 903 F.2d at 999.) A claim that the government deprived a former employee of the liberty interest to find future work is often referred to as a "stigma-plus" claim. *Ridpath*, 447 F.3d at 309 n.16.

To state such a claim under the Due Process Clause of the Fourteenth Amendment, the plaintiff must allege that the defendant's statements "(1) placed a stigma on [her] reputation; (2) were made public by the employer; (3) were made in conjunction with [her] termination or demotion; and (4) were false." *Sciolino*, 480 F.3d at 646. Even if those elements are shown, a plaintiff must further show that the defendant did not provide due process related to the public statements. *Cannon*, 891 F.3d at 501.

10

Of these elements, Westfall and Hourin specifically argue that Moschetti has not sufficiently alleged that their statements stigmatized her or that they did not provide her with due process. (Defs.' Mem. Supp. at 14–17.) To create a protected liberty interest, a statement must be so stigmatizing that it "implies 'the existence of serious character defects such as dishonesty or immorality.'" *Ridpath*, 447 F.3d at 308 (quoting *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982)). Insinuations of a serious character flaw *beyond* mere incompetence can give rise to a claim. *See Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555, 557–58 (4th Cir.1976).

In this case, after being asked about Moschetti's termination and her state court Petition, Hourin allegedly said that OSIG "models *integrity, trust and ethical behavior* and demonstrates the *highest standards of honest[y], respect and accountability*. For privacy reasons, OSIG cannot comment on personnel matters." (Am. Compl. ¶¶ 54–55 (emphasis in original)); ABC 8 News Article *supra* note 5, at 7.[8] According to Moschetti, this statement insinuated that she *did not* model integrity, trust, honesty, or ethics. (Am. Compl. ¶ 62.)

A reasonable person, however, would not understand Hourin's singular statement to make such a serious insinuation or implication. Hourin, the official spokeswoman for OSIG, merely said that OSIG models a variety of positive traits and confirmed that she *could not* comment on *any* personnel matters. (*Id.* ¶¶ 54–55.) The Court will not stretch the plain meaning of Hourin's statement to mean the *opposite* of what it says.

---

[8] Westfall never repeated these words, but Moschetti alleges that he approved of them. (*Id.* ¶ 55.)

11

Moreover, among a wealth of cases filed in federal court, Plaintiff does not cite any case that held a plaintiff could plead a stigma-plus claim on similar facts.[9] Instead, stigma-plus claims are generally premised on an overt, direct government statement that the plaintiff has a serious character flaw. *See, e.g., Cannon*, 891 F.3d at 502 (local government indicated that plaintiff committed sexual harassment); *Socol v. Albemarle Cnty. Sch. Bd.*, 399 F. Supp. 3d 523, 538 (W.D. Va. 2019) (school board announced that plaintiff had committed financial fraud). Even in *Cox*, the government "publicly linked [the plaintiff's] firing directly with [an] investigation of financial wrongdoing," and thus, more overtly placed stigma on the terminated employee than Hourin and Westfall did in this case. 551 F.2d at 557. Therefore, Moschetti does not adequately plead that any statement of Hourin or Westfall placed a stigma on her reputation. Consequently, she cannot satisfy the first element of her "stigma-plus" claim against them in Count I.[10]

---

[9] Instead, Plaintiff cites various cases relevant to her defamation claims in Count VI and seems to contend that they apply equally to her stigma-plus claim. (Pl.'s Mem. Opp'n at 14–17.) While the Court agrees that the question whether a defendant's statement is defamatory is similar to whether a defendant's statement implies "the existence of serious character defects" *Robertson*, 679 F.2d at 1092, it can find no case holding that the two questions are identical. Further, even accepting that the two questions are similar, Plaintiff does not adequately allege a claim of defamation against Hourin or Westfall either. *See* discussion *infra* Section III.C.

[10] Westfall and Hourin argue that, even if their statement was stigmatizing enough to state a claim, they did provide her with due process because she received a "name-clearing hearing" *after* the public statements were made and after her termination. (Defs.' Mem. Supp. at 16–17.) Westfall and Hourin, however, confuse related, but different, due process requirements. They cite cases where the employer merely terminated an employee but did not stigmatize their reputation by commenting on their termination. *See, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–46 (1985). In cases where stigmatization occurred, like Plaintiff alleges here, the United States Court of Appeals for the Fourth Circuit has required "a constitutionally adequate name-clearing hearing *before* publicly disclosing false information." *Cannon*, 891 F.3d at 506 (emphasis changed). According to the Amended Complaint, Westfall and Hourin did not provide any type of due process before making statements to the public. (Am. Compl. ¶ 59.)

Plaintiff fails to state a claim for a "stigma-plus" due process violation, and Count I of the Amended Complaint will be dismissed under Rule 12(b)(6) and under the first step of qualified immunity.  Because the Court will dismiss Count I on these grounds, it need not reach whether the alleged constitutional violation was clearly established. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

Moving to Plaintiff's other constitutional claim, in Count II, Moschetti alleges that Westfall retaliated against her for sharing the VLM report with individuals and organizations outside OSIG in violation of the Free Speech Clause of the First Amendment.  (Am. Compl. ¶¶ 69–75.)  To state a viable First Amendment retaliation claim, Moschetti must show three elements. *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012).  First, she must allege that she "was speaking as a citizen upon a matter of public concern" rather than "as an employee about a matter of personal interest." *Id.* Second, she must show that her "interest in speaking upon the matter of public concern outweighed the government's interest in managing the working environment." *Id.*  Third, she must show that her "speech was a substantial factor" in her ultimate termination. *Id.*

Westfall argues that Moschetti has not adequately pled either of the first two elements.  (Defs.' Mem. Supp. at 19–21.)  As to the first element, a matter of public concern must be "an issue of social, political, or other interest to a community." *Urofsky*

---

Thus, though Westfall and Hourin's statement *did not* stigmatize Moschetti, if it did, then Westfall and Hourin did not provide due process of law.

*v. Gilmore*, 216 F.3d 401, 406–07 (4th Cir. 2000) (en banc). It may not be "personal

complaints and grievances about conditions of employment." *Campbell v. Galloway*, 483

F.3d 258, 267 (4th Cir. 2007). The status of the plaintiff's speech "must be determined

by the content, form, and context of a given statement, as revealed by the whole record."

*Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

Westfall contends that Moschetti released information about the Parole Board

investigation because of her personal interest in not being fired. (Defs.' Mem. Supp. at

19–20.) This argument, however, misreads the Amended Complaint. Moschetti

consistently states that she released information about the Parole Board investigation

because she was worried about being silenced or that the investigation would be covered

up. (Am. Compl. ¶¶ 17–28, 34–35.) The content of Moschetti's speech—reports on the

Parole Board's misconduct—are certainly a matter of public concern. *See Durham v.

Jones*, 737 F.3d 291, 300–01 (4th Cir. 2013) (describing allegations of government

wrongdoing and misconduct as a matter of public concern). After all, the story consumed

the news media for some time. Moreover, the context of Moschetti's speech also shows

that she likely sought to inform the public. She did not share her reports internally within

OSIG but instead sent them to, among other, outside law enforcement and the General

Assembly. (Am. Compl. ¶¶ 34–35, 37, 45.) While the evidence after discovery may

show that Moschetti's motivations were different, the allegations in the Amended

Complaint create a reasonable inference that Moschetti released the VLM reports as a

citizen about a matter of public concern. *See Tobey*, 706 F.3d at 386.

14

Westfall also argues that Moschetti has not shown that her "interest in speaking about the matter of public concern outweighed the government's interest in managing the working environment." *Brooks*, 685 F.3d at 371. At this stage, the Court only asks whether the Amended Complaint sufficiently alleges that Moschetti's First Amendment expression could outweigh the government's interests. *Ridpath*, 447 F.3d at 318. Examining this element involves a balancing test adopted by the United States Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 573 (1968). As a part of the *Pickering* balancing test, the Court should consider a variety of factors including:

> whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

*Ridpath*, 447 F.3d at 318 (citing *McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998)). The Court must also consider the value of the employee's speech to the public. *Id.* at 317 n.28. Further, "a public employee, who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency . . . enjoys substantially less First Amendment protection" than others. *McVey*, 157 F.3d at 278.

In this case, Moschetti's expression involved releasing confidential reports from OSIG to a former law enforcement officer, a current Richmond police officer, the FBI, and the General Assembly. (Am. Compl. ¶¶ 34–37.) No statute authorizes Moschetti to

release confidential information to a former law enforcement officer. Moreover, as a quasi-law enforcement agency, OSIG has a heightened interest in keeping its reports and investigations confidential. *See* Va. Code Ann. §§ 2.2-307–313 (defining the powers and scope of OSIG).

Yet, Virginia's Fraud and Abuse Whistle Blower Protection Act (the "Whistle Blower Act"), Virginia Code § 2.2-3009, *et seq.*, affirmatively allows state employees, including OSIG investigators like Moschetti, to release confidential information detailing wrongdoing or abuse to law enforcement agencies and the General Assembly so long as they do so in good faith. This statute shows that Moschetti's release of information to a Richmond police officer, the FBI, and the General Assembly would not have undermined the mission of OSIG or its interests in confidentiality or administration. *See Ridpath*, 447 F.3d at 318 (listing *Pickering* factors). In fact, it suggests that Moschetti's release of information to those parties not only outweighs the government's interests, but should be within the government's interests. Thus, taking the Amended Complaint's allegations as true, OSIG's interests in *stopping* Moschetti from releasing the draft VLM reports to those parties is very low compared to relevant First Amendment interests, and the *Pickering* balancing test at this stage comes out in Moschetti's favor.

Of course, Moschetti might not be able to rely on the Whistle Blower Act to defend her release of the VLM report to a *former* law enforcement officer. There are strong governmental interests that may countermand her release of information to that individual. Nevertheless, at this juncture, the Court cannot assume whether OSIG

16

terminated Moschetti because of her leak to the former law enforcement officer, because of her leak to the other parties, or because of some unrelated reason. Instead, the Court must take Moschetti's allegations as true and accept the reasonable inference that Westfall terminated her in retaliation for releasing the VLM report to the FBI, the General Assembly, or the Richmond police officer. *See Tobey*, 706 F.3d at 386.

Revisiting the *Pickering* balancing test after thorough discovery may reveal that the government's interests do outweigh Moschetti's. At this juncture, however, Moschetti has offered a slate of plausible allegations that, if proven, could show that her interests in free expression outweigh the government's interests. *See Ridpath*, 447 F.3d 292, 317 (noting the test at the 12(b)(6) stage is whether plaintiff *could* build a factual record to support her claim after discovery). Thus, Moschetti has alleged a viable First Amendment retaliation claim in Count II that passes the standard of review under Rule 12(b)(6) and the first step of qualified immunity.

Even so, the inquiry related to Count II does not end there. As part of qualified immunity, the Court must analyze whether Westfall violated a clearly established constitutional right. *Pearson*, 555 U.S. at 232. A First Amendment right to speak to law enforcement about government misconduct is clearly established within the Fourth Circuit. In *Robinson v. Balog*, the Fourth Circuit agreed that two government employees had a First Amendment right to speak to federal law enforcement officials and lawmakers about government corruption and wrongdoing. 160 F.3d 183, 189–91 (4th Cir. 1998). In *Durham v. Jones*, the Fourth Circuit similarly found "it was clearly established law . . .

that an employee's speech about serious government misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected." 737 F.3d 291, 303–04 (4th Cir. 2013) (internal citations omitted).[11]  Therefore, at the time of the alleged violation, Moschetti's First Amendment right was clearly established and Westfall was appropriately on notice that his alleged actions were unlawful. *See id.*  The Court will deny Westfall's Motion to Dismiss Count II on qualified immunity grounds at this stage.

## B.      Counts III, IV, and V: State Law Wrongful Termination Claims

In Count III, Moschetti claims that Westfall wrongfully terminated her in violation of Virginia Code § 2.2-3011.  (Am. Compl. ¶ 76–84.)  That statute states that "no employer may discharge, threaten, or otherwise discriminate or retaliate against a whistleblower whether acting on his own or through a person acting on his behalf or under his direction" and allows for plaintiffs to bring a civil action against their employer to remedy a violation.  Va. Code. Ann. § 2.2-3011.

Westfall primarily argues that Count III is barred by principles of *res judicata*—either claim preclusion or issue preclusion—and should be dismissed under Rule 12(b)(1).  (Defs.' Mem. Supp. at 21–23.)  He contends that Moschetti's administrative grievance hearing and subsequent appeal to the Circuit Court of the City of Richmond, Virginia should bar her from raising the same claim and issues in this new lawsuit.  (*Id.*)  In Virginia, *res judicata* is prescribed by Supreme Court of Virginia Rule 1:6(a).  Rule

---

[11] *See also Andrew v. Clark*, 561 F.3d 261, 269 (4th Cir. 2009) (denying motion to dismiss where police officer released memorandum to reporter); *Smith v. Gilchrist*, 749 F.3d 302, 312–13 (4th Cir. 2014) (denying qualified immunity to government official who fired employee for speaking to media about government program).

1:6(a) instructs that a case may only have a preclusive effect on subsequent litigation where that case was "decided on the merits by a final judgment." S. Ct. Va. R. 1:6(a). Both parties agree that *no final judgment* has been entered in Moschetti's case pending in Richmond Circuit Court. (Defs.' Mem. Supp. at 22; Pl.'s Mem. Opp'n at 26.)

Despite the lack of a final judgment, Westfall argues that the *factual* findings of the grievance hearing officer are final under Virginia law and can therefore have a preclusive effect. (Defs.' Reply at 14–15.) It is true that the Circuit Court of the City of Richmond may only be able to reverse those parts of the grievance hearing decision that were "contradictory to law" and could not substitute the grievance hearing officer's factual findings for its own. *See Va. Polytechnic Inst. & State Univ. v. Quesenberry*, 674 S.E.2d 854, 858–59 (Va. 2009); *Passaro v. Va. Dep't of State Police*, 796 S.E.2d 439, 444 (Va. Ct. App. 2017). Nevertheless, the Circuit Court could theoretically find that the hearing officer below failed to consider certain evidence or failed to follow certain procedural requirements and remand the case for further consideration. *See Passaro*, 796 S.E.2d at 443; *Dep't of Corrs. v. Garrett*, No. 456-21-2, 2022 WL 677897, at *4 n.5 (Va. Ct. App. Mar. 8, 2022) (noting that a remand back to the hearing officer can be appropriate in certain circumstances). This Court cannot and should not predict what the Circuit Court of the City of Richmond or other Virginia courts will do. Thus, it would be inappropriate to give preclusive effect to even the factual findings of the hearing officer until they are confirmed in a final judgment. Thus, Count III is not barred by principles of *res judicata* at this time and Westfall's Motion to Dismiss Count III under Rule

19

12(b)(1) will be denied.[12]

Westfall also briefly argues that Count III should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. (Defs.' Mem. Supp. at 15 n.11.)  Moschetti alleges that she acted in good faith as a whistleblower by releasing the VLM report and other OSIG reports to the General Assembly, the FBI, and a Richmond police officer.  (Am. Compl. ¶¶ 78–82.)  She also alleges that soon after she took these actions, Westfall terminated her employment. (*Id.* ¶ 49.)  These allegations create a reasonable inference that Westfall terminated her because she acted as a whistleblower in violation of Virginia Code § 2.2-3011.  Consequently, Westfall's Motion to Dismiss Count III under Rule 12(b)(6) will also be denied.

In Count IV, Moschetti alleges a *Bowman* claim against Westfall.  In *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985), the Virginia Supreme Court recognized a cause of action for firing someone in violation of public policy.  While employers generally have the right to terminate an employee for any reason or no reason at all, *Bowman* represents a narrow exception to that right.  *Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis., Inc.*, 796 S.E.2d 188, 190 (Va. 2017).  To plead a *Bowman* claim, a plaintiff must allege one of three things: (1) that "an employer violated a policy enabling the exercise of an employee's statutorily created right;" (2) that an employer violated public policy that is *"explicitly expressed* in [a] statute and the

---

[12] This is not to say that this case and the case before the Circuit Court of the City of Richmond should necessarily continue in tandem.  Other reasons besides *res judicata* may counsel this Court to stay this case or dismiss Count III, but the parties have not presented those reasons to the Court.

employee was *clearly* a member of that class of persons directly entitled to the protection enunciated by the public policy;" or (3) that an employer discharged the employee "based on the employee's refusal to engage in a criminal act." *Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2002) (emphasis added).

Plaintiff cites eight different statutes that allegedly create a right in an employee like herself. (Am. Compl. ¶ 87.) Yet, *none* of the statutes she lists create any right or endorse any public policy that could be vindicated through a *Bowman* claim. Six of the statutes cited by Moschetti clearly do not create any rights related to her employment and require no in-depth discussion.[13] The last two statutes she cites, Va. Code. Ann. §§ 40.1-27.3 and 2.2-3011, create causes of action and provide remedies in themselves, and thus, cannot be used to sustain a *Bowman* claim. *Carmack v. Virginia*, No. 1:18cv31, 2019 WL 1510333, at *13 (W.D. Va. April 5, 2019); *see Judy v. Nat'l Fruit Prod. Co.*, 40 Va. Cir. 244, 244–45 (Va. Cir. Ct. 1996) (finding that Va. Code Ann. § 40.1-51.2:2 provides its own remedy and so cannot support a *Bowman* claim). Because Plaintiff cites to no violations of public policy in statutes or otherwise, she has failed to state a *Bowman* claim, and her claims in Count IV will be dismissed under Rule 12(b)(6).

In Count V of the Amended Complaint, Plaintiff alleges that OSIG, the

---

[13] *See* Va. Code Ann. §§ 53.1-136(2) (outlining the powers and duties of the Probation and Parole Board but not creating a right or explicitly reflecting the public policy of Virginia), 53.1-55 (prohibiting the sale or exchange of goods made by prisoners), 53.1-139(1) (outlining the administrative powers of the Probation and Parole Board Chairman), 53.1-154 (outlining when the Parole Board meets), 2.2-309 (outlining the powers and duties of the Inspector General, not his subordinates), 2.2-313 (outlining how the Inspector General should report to the Governor and the Virginia General Assembly).

Commonwealth, and Westfall terminated her in violation of Virginia Code § 40.1-27.3. (Am. Compl. ¶¶ 90–94.)  In relevant part, that statute states that "[a]n employer shall not discharge . . . an employee . . . because the employee . . . in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official." Va. Code Ann. § 40.1-27.3(A).  The statute further authorizes any employee to sue her "employer" and seek an injunction, reinstatement, compensation for lost wages, and reasonable attorney fees and costs." *Id.* § 40.1-27.3(C).

First, Defendants argue that Count V should be dismissed pursuant to Rule 12(b)(1) because sovereign immunity bars any cause of action under this statute against OSIG or the Commonwealth. (Defs.' Mem. Supp. at 23–24.)  "[T]he Commonwealth is immune from tort liability for the acts or omissions of its agents and employees unless an express statutory or constitutional provision waives that immunity." *Ligon v. Cnty. of Goochland*, 689 S.E.2d 666, 668 (Va. 2010).  The Virginia Supreme Court has routinely found that general statutory language *is not* enough to waive sovereign immunity. *Id.* at 670 (listing other cases where general statutory language did not waive sovereign immunity).  Sovereign immunity protects not only the Commonwealth, but also its agencies and instrumentalities. *Rector & Visitors of the Univ. of Va. v. Carter*, 591 S.E.2d 76, 78 (Va. 2004).

Virginia Code § 40.1-27.3 contains no express waiver of sovereign immunity. The statute never mentions the Commonwealth, its agencies, or its officers and only creates liability for "employers" without expressly including the Commonwealth within

the definition of that term.  Va. Code. Ann. § 40.1-27.3; *see id.* § 40.1-2 (defining

employer in Title 40.1 generally).  Thus, the Commonwealth and its agencies, including

OSIG, are immune from suit under § 40.1-27.3.  *See Ligon*, 689 S.E.2d at 668.

Accordingly, Count V as alleged against the Commonwealth and OSIG, will be

dismissed under Rule 12(b)(1).

Second, Defendants argue that Moschetti cannot maintain suit against Westfall

under § 40.1-27.3 in Count V because he does not fall within the definition of an

"employer" under that statute.  (Defs.' Mem. Supp. at 24.)

> 'Employer' means an individual, partnership, association, corporation, legal
> representative, receiver, trustee, or trustee in bankruptcy doing business in or
> operating within this Commonwealth who employs another to work for
> wages, salaries, or on commission and shall include any similar entity acting
> directly or indirectly in the interest of an employer in relation to an employee.

Va. Code Ann. § 40.1-2.  While Westfall supervised Moschetti at OSIG, he did not

*employ* her within the meaning of the statute.  Nor does Westfall act "directly or

indirectly in the interest of an employer," because, as mentioned above, the

Commonwealth and OSIG are not *employers* under the meaning of the statute.  *See id.*[14]

Therefore, Moschetti has failed to state a claim against Westfall under Virginia Code §

40.1-27.3 and Count V against Westfall will be dismissed under Rule 12(b)(6).

## C.    Count VI: Defamation Claims

In Count VI, Plaintiff alleges that Westfall, Hourin, Mercer, and Moran defamed

---

[14] In contrast, the Whistle Blower Act defines "employer" to mean "a person supervising one or
more employees, including the employee filing a good faith report, a superior of that supervisor,
or an agent of the *governmental agency*."  Va. Code Ann. § 2.2-3010 (emphasis added).

her through various statements they made to the public. (Am. Compl. ¶¶ 95–102.)  Under

Virginia law, there is only one cause of action for defamation instead of distinct actions

for libel and slander. *Shupe v. Rose's Stores, Inc.*, 192 S.E.2d 766, 767 (Va. 1972).  For a

plaintiff to succeed on her defamation claim, she must show "(1) publication of (2) an

actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 772 S.E.2d

589, 594 (Va. 2015) (quoting *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013)).

Defendants do not contest publication or intent and, instead, only argue that the

allegedly defamatory statements are not actionable. (Defs.' Mem. Supp. at 26–29.)  To

be actionable, a statement must be both false and defamatory. *Schaecher*, 772 S.E.2d at

594.  Whether a statement is actionable is a question of law that is decided by the court.

*Gilbertson v. Jones*, No. 3:16cv255, 2016 WL 4435333, at *6 (E.D. Va. Aug. 17, 2016)

(quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)).[15]

The Court will first address Plaintiff's defamation claim against Hourin and

Westfall.  Plaintiff alleges that Westfall and Hourin defamed her when Hourin issued the

---

[15] Defamatory words which are actionable per se at common law are:

> (1)  Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished.  (2)  Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society.  (3)  Those which impute to a *person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment*.  (4)  Those which prejudice such person in his or her profession or trade.

*Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 591 (Va. 1954) (emphasis added).  Moschetti contends that all of Defendants' statements cast doubt on her fitness or integrity to be an investigator.

24

statement, approved by Westfall, that OSIG "models *integrity, trust and ethical behavior* and demonstrates the *highest standards of honest[y], respect, and accountability*. For privacy reasons, OSIG cannot comment on personnel matters." (Am. Compl. ¶¶ 54–55, 96); ABC 8 News Article *supra* note 5, at 7. Plaintiff argues that this statement was defamatory because (1) the statement was issued in response to a press question regarding her termination, and (2) that by outlining the positive characteristics of OSIG, Westfall and Hourin implied that Plaintiff lacked such characteristics. (*Id.* ¶¶ 95–102.) In contrast, Defendants argue that Westfall and Hourin's statement was not defamatory because it did not imply anything harmful about Plaintiff. (Defs.' Mem. Supp. at 27.)

A statement's defamatory meaning need not be directly obvious, and "may be made by inference, implication, or insinuation." *Carwile*, 82 S.E.2d at 592. In determining whether a statement is reasonably capable of conveying a defamatory innuendo, a reviewing court must draw all inferences in the plaintiff's favor. *Webb v. Virginia-Pilot Media Cos.*, 752 S.E.2d 808, 811 (Va. 2014) (quoting *Carwile*, 82 S.E.2d at 592). However, in discerning whether a statement is defamatory, the court must look only to the "ordinary and common" meaning of the words. *Id.* Moreover, "[t]he province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it [cannot] introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain." *Id.*

Looking to the "ordinary and common" meaning of the statement, a reasonable person would not view Westfall and Hourin's words as defamatory. In the ABC 8 News Article in which Hourin's statement was published, OSIG affirmatively declined to

25

comment on Plaintiff's pending litigation and her termination. OSIG's statement, released through Hourin, its spokeswoman, merely recited positive characteristics of OSIG. (Am. Compl. ¶ 54.) Contrary to Plaintiff's assertion, reasonable interpretation of such a generalized policy statement does not suggest that Plaintiff lacks such characteristics. Moreover, as the full text of the article reveals, Hourin's comments were responding to a question about Moschetti's termination *and* allegations that OSIG had acted improperly. *See* ABC 8 News Article *supra* note 5, at 7. Considering the entire context, the statement created no innuendo defaming Moschetti.

*Pendleton v. Newsome* serves as a useful comparison. 772 S.E.2d 759 (Va. 2015). In that case, the Virginia Supreme Court examined generalized statements made by school board officials that falsely implied that a mother caused her own child's death due to a peanut allergy. *Id.* at 763. The officials' statements, while not directly naming the mother, were issued in direct response to her side of the story, which had been widely reported in the press. *Id* at 763–64. Because of this context, including that the statements were numerous, consistent, and issued by various officials within the school system, the *Pendleton* court held that the statements could plausibly convey a defamatory innuendo. *Id.* at 764–65.

The present case is conspicuously different. Westfall and Hourin issued only a single statement outlining the general policy prerogatives of OSIG, and stated that the office would not comment on Plaintiff's claims. (Am. Compl. ¶¶ 54–55.) Unlike the repeated statements at issue in *Pendleton*, the *single* statement by Hourin did not convey the same defamatory innuendo. Further, unlike the officials' statements in *Pendleton*,

26

which related to the handling of peanut allergies by parents, Westfall and Hourin's

statement had no clear connection to Plaintiff.  On the contrary, their statement explicitly

distanced OSIG from the specifics of Plaintiff's termination when they stated that OSIG

could not comment on personnel matters.

    This case can also be distinguished from *Gilbertson*. 2016 WL 4435333.  In that

case, a school superintendent defamed a former employee when he said that, "if an

employee is suspended, generally, it's going to be related to performance." *Id.* at *5.

The court found that the superintendent's statement was defamatory because it was stated

in an interview about the poor quality of school food and after the superintendent

mentioned that the former employee had been suspended. *Id.* at *8.

    Plaintiff's allegations are different for two reasons.  First, the plain language of the

statement at issue in *Gilbertson* is more targeted toward the former employee than

Westfall and Hourin's statement here.  In *Gilbertson*, the superintendent's statement

essentially said that the former employee was terminated because of performance, while

Hourin's statement merely stated the generalized and high-level characteristics of OSIG,

and overtly declined to comment about Moschetti.  *See id.*  Second, the context

surrounding Westfall and Hourin's statement is different.  While the superintendent in

*Gilbertson* issued the statement immediately after stating that the former employee had

been terminated, *id.* at *1, Westfall and Hourin issued their statement in response to a

press inquiry regarding Plaintiff's newly filed Petition in state court, and her possible

termination, *see* ABC 8 News Article *supra* note 5, at 7.

    The present case is more like the alleged defamation in *Webb*, 752 S.E.2d 808.  In

27

that case, a local newspaper reported that two high school students, Kevin and Brian, were both convicted of misdemeanors but received different punishments at their high school. *Id.* at 810. Kevin *remained* at his school, while Brian was only offered the chance to transfer schools. *Id.* The article pointed out that Kevin's father was the assistant principal of a high school in the same school district and quoted a school spokesperson who stated that "a school principal typically determines whether a student is in good standing." *Id.* The article further quoted the spokesperson as stating that Kevin "did not get preferential treatment because of his dad's position." *Id.* Kevin's father claimed that the article defamed him by falsely implying that he, as an assistant principal, obtained preferential treatment for his son. *Id.* The *Webb* court held that the article was not defamatory because (1) it did not allege any specific acts of wrongdoing by Kevin's father, and (2) the school spokesperson dispelled any reasonable implication of wrongdoing by explicitly stating that Kevin did not receive preferential treatment because of his father's position. *Id.* at 811–12.

Like the allegedly defamatory statements in *Webb*, the statement at issue in the present case was printed in a *single* article and the government statements included in the article merely repeated the policies of an organization. Moreover, like the spokesperson in *Webb*, Hourin explicitly denied any connection between her comments about OSIG and Moschetti's termination. Finally, as in *Webb*, there is no clear connection between Hourin's statement and Moschetti because Hourin made only a boilerplate statement about OSIG without any specific reference to Moschetti's specific conduct as an employee. Thus, despite Plaintiff's claims, Hourin's statement is "not reasonably capable

28

of the defamatory meaning [Moschetti] ascribes to it." *Id.* at 812.  Accordingly, the Court finds that Westfall and Hourin's statement does not constitute defamation and is not actionable.

Next, the Court must address Plaintiff's defamation claim against Mercer and Moran.  Moschetti alleges that Moran and Mercer made a total of four statements. During a news conference, Mercer said, "We went into that meeting *thinking* that there was bias and there was [a] lack of objectivity" and, "[w]e left that meeting *knowing* that there was *bias and a lack of objectivity in that report*." (Am. Compl. ¶ 51 (emphasis in original).)  Mercer also said that Moschetti's whistleblower Petition was a "political ploy to hurt the Northam administration and other state leaders." (*Id.* ¶ 52.)  In a radio interview around the same time, Moran said that Moschetti's report was "biased" and "would not hold up under 'cross examination.'" (*Id.* ¶ 53.)

Defendants argue that Moran and Mercer's statements were opinion and, therefore, not actionable.  (Defs.' Mem. Supp. at 27–29.)  The Supreme Court and the Fourth Circuit have wrestled with the contours of actionable fact and non-actionable opinion for some time. *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); *Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990); *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998).  Most recently, the Fourth Circuit instructed courts to "assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message." *Snyder*

29

*v. Phelps*, 580 F.3d 206, 219 (4th Cir. 2009).[16]

Within this assessment there are two subcategories of speech that are not actionable. *Id.* "First, the First Amendment serves to protect statements on matters of public concern that fail to contain a 'provably false factual connotation.'" *Id.* (quoting *Milkovich*, 497 U.S. at 20).[17] The second subcategory of protected speech encompasses statements which use "loose, figurative, or hyperbolic language." *Id.* (quoting *Milkovich*, 497 U.S. at 21). This is because such language and "[t]he general tenor of rhetorical speech . . . sufficiently negates any impression that the speaker is asserting actual facts." *Id.* Whether a statement constitutes opinion within these categories is to be determined by the Court. *Id.* at 219–20.

Given the highly fact-specific nature of this inquiry and because all reasonable inferences must be decided in Plaintiff's favor, the Court hesitates to dismiss Plaintiff's claims stemming from three of Mercer and Moran's statements. These three statements contain a provable, factual connotation. *Snyder*, 580 F.3d at 219. Whether Moschetti's report, and therefore her work product more generally, is biased or lacks objectivity is

---

[16] While Count VI alleges a claim for defamation, a tort claim under Virginia law, the issue of whether a statement is opinion or not arises out of the First Amendment. *Snyder*, 580 F.3d at 219 ("[T]he [Supreme] Court has recognized that there are constitutional limits on the *type* of speech to which state tort liability may attach.") (citing *Milkovich*, 497 U.S. at 16); *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008) (holding that state law defamation claims are limited by the First Amendment). Thus the Court may look to federal law, and not just Virginia law, to determine whether Mercer and Moran's statements are actionable in this case.

[17] "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Snyder*, 580 F.3d at 220 (quoting *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 446 (4th Cir. 2004)). Defendants' statements relate to the Parole Board investigation, and thus, involve a matter of public concern.

verifiable. The accuracy of the VLM report could be verified by outside sources, and witnesses could give testimony on Moschetti's motives and interests in writing the report. Moran's statement that Moschetti's report "would not hold up under 'cross examination'" (Am. Compl. ¶ 53), effectively states that her report was untrue or incomplete. This, too, could be proven by presenting verifiable evidence about Moschetti's work and the contents of the report. Perhaps some, if not all, of these statements are the type of loose rhetoric that, in context, is protected by the First Amendment. *See Snyder*, 580 F.3d at 219. Yet, the Court does not know the full context or general tenor of the statements because discovery has not been completed. At this stage, based only on the statements' plain meaning and the context contained in the Amended Complaint, an objective, reasonable person could have interpreted Moran and Mercer's statements as asserting facts. *See id.*

Lastly, Mercer's statement that Moschetti's state court Petition was a "political ploy to hurt the Northam administration and other state leaders" (Am. Compl. ¶ 52), is different. Even with the limited context supplied by the Amended Complaint, this statement is certainly "rhetorical hyperbole" that no reasonable person would interpret as fact. *Snyder*, 580 F.3d at 220. Mercer did not mean to assert that he *knew* Moschetti's motives in filing the Petition were only political or that her entire legal claim was contrived. Instead, in the heat of a debate on a matter of public concern, he used strong language to make his point. Similar "imaginative expression . . . has traditionally added much to the discourse of the Nation." *Milkovich*, 497 U.S. at 20. Courts have

consistently held that colorful, hyperbolic rhetoric is protected by the First Amendment and not actionable in a claim for defamation. *See Letters Carriers v. Austin*, 418 U.S. 264, 284–86 (1974) (concluding that calling a person who crossed a picket line a "traitor" was not actionable); *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13–14 (1970) (holding that calling a negotiating tactic "blackmail" was protected); *CACI Premier Tech., Inc.*, 536 F.3d at 301–02 (concluding that calling someone a "hired killer" was loose and hyperbolic and not actionable).[18]

In summation, the Court concludes that Hourin and Westfall's statement is not actionable because it does not insinuate anything defamatory about Moschetti. As to Moran and Mercer, three of their four statements could reasonably assert actual facts and appear to be actionable at this stage. However, Mercer's statement that Plaintiff's Petition is a political ploy is not actionable. Thus, the Court will grant the Motion to Dismiss Count VI as to Westfall and Hourin, deny it as to Moran, and partially deny it as to Mercer.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss as to Counts I, IV, and V. The Court will deny the Motion to Dismiss as to Counts II and III. The Court will partially grant and partially deny the Motion to Dismiss as to Count

---

[18] Defendants also argue that Count VI is barred by qualified privilege. (Defs.' Mem. Supp. at 29–30.) Qualified privilege does not apply to the statements alleged in this case, however, because Defendants allegedly made them to the public, either in a comment to the media, at a press conference, or during a radio show. *See Echtenkamp v. Loudon Cnty. Public Schs.*, 263 F. Supp. 3d 1043, 1061 (E.D. Va. 2003) (noting that the qualified privilege only applies where the third party who heard the statement has an interest or duty in the statement).

VI according to this Memorandum Opinion and the accompanying Order.  Lastly,

Plaintiff's Motion to Strike will be denied as moot.

An appropriate Order will accompany this Memorandum Opinion.

/s/ _____

Henry E. Hudson
Senior United States District Judge

Date: **August 11, 2022**
Richmond, Virginia