IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

JENNIFER MOSCHETTI,       )
                          )
            Moschetti,    )
                          )
v.                        )        Civil Action No. 3:22-cv-24–HEH
                          )
OFFICE OF THE INSPECTOR   )
GENERAL, *et al.*,        )
                          )
            Defendants.   )

## MEMORANDUM OPINION
### (Granting Summary Judgment)

THIS MATTER is before the Court on Defendant Michael C. Westfall's

("Westfall") Motion for Summary Judgment (the "Westfall Motion," ECF No. 97), and

Defendants Clark Mercer ("Mercer") and Brian Moran's ("Moran") (collectively,

"Defendants") Motion for Summary Judgment (the "Mercer Motion," ECF No. 99), both

filed on September 11, 2024.

Plaintiff Jennifer Moschetti ("Moschetti"), a former investigator for Virginia's

Office of the State Inspector General ("OSIG"), brings claims against several government

officials for allegedly violating her First Amendment right and defaming her.  At this

stage in the case, four (4) claims remain from her Amended Complaint: Count II – First

Amendment Retaliation (against Westfall); Count III – Wrongful Termination under

Virginia Code § 2.2-3011 (against Westfall); and Count VI – Defamation (against Mercer

and Moran).

The parties have filed memoranda supporting their respective positions, and the

Court heard oral argument on October 7, 2024.  At the hearing, the Court granted

Defendants' Motions for Summary Judgment for the reasons articulated below.

## I.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate

"if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The relevant

inquiry is "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Once a motion for

summary judgment is properly raised and supported, the opposing party bears the burden

of showing that a genuine dispute of material fact exists. *See Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis

in original).  A material fact is one that might affect the outcome of a party's case. *Id.*

at 248; *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019).  A genuine issue

concerning a material fact only arises when the evidence, viewed in the light most

favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return

a verdict in the party's favor. *Anderson*, 477 U.S. at 248.  Without more, neither a

scintilla of evidence in support of the nonmoving party nor conclusory allegations or

2

denials are sufficient to withstand a summary judgment motion. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting *Anderson*, 477 U.S. at 249–50) (internal quotations omitted).

## II.   BACKGROUND

When applying the summary judgment standard, courts "must construe the facts in the light most favorable to [the nonmoving party] and [] may not make credibility determinations or weigh the evidence." *Id.* at 213 (citations omitted). Applying this standard, the following narrative represents the salient facts in this case.[1]

Moschetti joined Virginia's Office of the State Inspector General as a Senior Investigator in early 2020. (Westfall SUF ¶ 7.) As an investigator, she was responsible for managing investigations and audits into allegations of fraud, waste, abuse, and corruption that were reported to OSIG's complaint hotline. (*Id.*) Due to the sensitive nature of her job, Moschetti executed a written confidentiality statement agreeing not to disclose confidential or proprietary information through any means, in addition to three

---

[1] The Court cites to the statement of undisputed facts ("Westfall SUF" or "Mercer SUF") contained in Moschetti's or Defendants' briefing wherever appropriate. (Westfall Mem. in Supp. at 5–22, ECF No. 98; Moschetti Resp. in Opp'n to Westfall at 15–17, ECF No. 103; Mercer Mem. in Supp. at 5–19, ECF No. 100; Moschetti Resp. to Mercer at 1–2, ECF No. 104.) Otherwise, the Court cites directly to the exhibits submitted by the parties. Moschetti also offers her own counter statement of material facts ("Pl.'s SUF"). (Moschetti Resp. in Opp'n to Westfall at 2–15.) The Court notes that these facts do not materially diverge from the parties' SUF.

separate Non-Disclosure and Security Agreements ("NDAs") throughout her employment.  (Westfall SUF ¶ 8.)

In mid-April 2020, OSIG received a complaint on its hotline stating concerns about the Virginia Parole Board ("Parole Board" or "Board").  (Westfall SUF ¶ 11.)  The allegations included that the Board was failing to follow proper policies and procedures in parole decisions, particularly decisions regarding Vincent L. Martin, a man who had been convicted of killing a Richmond police officer.  (*Id.*)  After receiving additional complaints, OSIG opened an investigation into the Parole Board specifically with the limited scope of addressing only whether the Parole Board was following their required policies and procedures, not whether any particular parole decision was appropriate.  (Westfall SUF ¶¶ 12–13.)  Moschetti was assigned to this investigation.  (Westfall SUF ¶ 14.)

Based on her investigation, Moschetti concluded the Parole Board violated seven sections of the Virginia Code or the Parole Board's policies and procedures, as well as three miscellaneous concerns related to Former Parole Board Chair Adrianne Bennett.  (Westfall SUF ¶¶ 15–16.)  With these conclusions, Moschetti drafted an initial report outlining these allegations (the "VLM Report").  (Westfall SUF ¶ 17.)  With the input of several other investigators and OSIG personnel, Moschetti's draft went through several cycles of edits.  (*Id.*)  These cycles included reviews by Deputy Inspector General Corrine Louden ("Louden") and Inspector General Westfall.  (Westfall SUF ¶¶ 18–19.)  As a result of these edits, Moschetti's draft of the VLM Report was reduced from

fourteen (14) pages to nine (9) pages, and, after further input from Assistant Attorney General Mike Jagels,[2] it was condensed from nine (9) pages to its final six (6) page version in June 2020. (Westfall SUF ¶ 20.) Moschetti believed that these reductions "sanitized and shortened" the VLM Report, removing key items from it. (Westfall SUF ¶ 21.)

Motivated by these concerns, Moschetti began sharing working drafts of the VLM Report and other confidential materials with individuals outside of OSIG. (Westfall SUF ¶ 22.) In June and July of 2020, Moschetti transmitted prior versions of the VLM Report and other confidential investigative materials, via her personal email, to Ms. Mindy Applewhite and Mr. Keith Applewhite. (*Id.*) Ms. Applewhite was a former examiner with the Virginia Parole Board—and the individual who had also filed the OSIG hotline complaint against the Board—and Mr. Applewhite was a former law enforcement officer. (M-Applewhite Decl. ¶ 1, ECF No. 98-6[3]; Pl.'s SUF ¶ 35.) In July 2020, Moschetti also shared a copy of her 14-page draft VLM Report with Marley Williams, a law enforcement officer and personal friend of Moschetti. (Westfall SUF ¶ 23.)

On July 28, 2020, the final VLM Report was officially shared with the then-Governor Ralph Northam Administration, including Moran, the Secretary of Public

---

[2] Jagels functioned as OSIG's in-house legal counsel.

[3] Moschetti objects to the inclusion of both Ms. and Mr. Applewhite's Declarations. (Pl.'s Resp. in Opp'n at 14–15.) The basis of her objection is Westfall's failure to include them in his initial disclosures. (*Id.*) The Court rejects Moschetti's argument because Westfall adequately incorporated the Applewhites into his initial disclosure by referencing Moschetti's initial disclosure, where she identified the Applewhites. (Westfall Rely at 7, ECF No. 108.)

Safety and Homeland Security, and Mercer, Chief of Staff to Governor Northam. (Westfall SUF ¶ 28.)  A week later, the final VLM Report was shared with the members of the Virginia General Assembly and released to the public.  (Westfall SUF ¶ 29.)

On August 14, 2020, Moran and Mercer, along with others, held an in-person meeting with Westfall, Louden, and Moschetti concerning the VLM Report.  (Westfall SUF ¶ 31.)  Fearing for her job, Moschetti recorded the meeting.  (*Id.*)  At the meeting, while Moschetti was recognized as the primary drafter of the VLM Report, Westfall took ownership of the VLM Report and fielded substantive questions defending the Report. (Westfall SUF ¶ 32; Ex. K, ECF 103.)  During the meeting, Moran and Mercer questioned the contents of the VLM Report, including why certain information was included and other information omitted from the Report.  (Ex. K, ECF No. 103.)  Later that evening, Moschetti and her then-boyfriend met Mr. and Ms. Applewhite for dinner. (Westfall SUF ¶ 33.)  At dinner, Moschetti shared the audio recording of the meeting with Mr. Applewhite and discussed the Parole Board investigation with the Applewhites. (*Id.*)

On February 25, 2021, a copy of the fourteen (14) page working draft of the VLM Report and other confidential materials were made public by the news media.  (Westfall SUF ¶ 35.)  In response to this coming to light, OSIG announced it would begin an internal investigation, and Westfall requested the Virginia State Police to investigate as well.  (Westfall SUF ¶ 36.)  At this time, Moschetti was "freaking out because it was

never [her] motivation, [her] plan, [or] idea to ever involve the media."[4] (Westfall SUF ¶ 37; Moschetti Dep. at 142:16–19, ECF No. 98-3.)

On March 3, 2021, Moschetti—as an anonymous whistleblower—released a partial copy of her investigation files to the Virginia General Assembly, including drafts of the VLM Report and drafts related to other OSIG investigations into the Parole Board decisions. (Pl.'s SUF ¶ 49.) The next day, OSIG learned that the General Assembly had received these investigative materials and drafts. (Westfall SUF ¶ 39.) On March 5, as part of OSIG's internal investigation, OSIG reviewed Moschetti's email inbox—discovering she had sent to her personal email confidential materials in violation of OSIG policy—and informed her she was being placed on pre-disciplinary leave. (Westfall SUF ¶ 40.) That same day—but after being placed on pre-disciplinary leave—Moschetti identified herself to OSIG as the anonymous whistleblower and, three days later, initiated a mandamus action in state court. (Westfall SUF ¶¶ 40–41.)

Later that month, after discussions between OSIG and Moschetti, OSIG formally terminated Moschetti's employment for violating agency policy regarding twenty-five (25) transmissions of sensitive and confidential investigative materials to her personal email account. (Westfall SUF ¶ 42.) Moschetti challenged this decision through an administrative hearing (the "Grievance Hearing") pursuant to the Virginia State Grievance Procedure. (Westfall SUF ¶ 45.) After hearing evidence and argument, the

---

[4] It is not clear based on the record who leaked the drafts to the news media, but neither is it material to the Court's decision.

Hearing Officer upheld Moschetti's dismissal and found she did not qualify as a whistleblower. (Westfall SUF ¶ 46.)

### A. Mercer's Alleged Defamatory Statements

During a press conference on March 9, 2021, Mercer fielded a question from a member of the press regarding the meeting on August 14, 2020, concerning the VLM Report. Mercer stated, "We went into that meeting thinking there was bias and there was a lack of objectivity," and "We left that meeting knowing that there was bias and a lack of objectivity in that report." (Mercer SUF ¶ 35.)[5]

### B. Moran's Alleged Defamatory Statements

Beginning in the Spring of 2020, Moran was a regular guest on a radio program, the John Reid Show, on Friday mornings to discuss COVID-19 issues and updates. (Mercer SUF ¶ 25.) In March 2021, sometime after Moschetti identified herself as the anonymous whistleblower to the General Assembly, Moran stated that the VLM Report was "biased" and Moschetti "would not hold up under cross examination." (Mercer SUF ¶ 25.) Moschetti did not listen to the show live, but watched it later that day, after someone notified her about Moran's comments. (Mercer SUF ¶ 35.)

---

[5] Moschetti did not produce any recordings of either Mercer's or Moran's statements to reinforce her claim. Instead, Moschetti relied on her own memory of the statements. Nonetheless, the Court will assume that Moschetti's recollection of the statements are in fact accurate for the purpose of summary judgment.

## III.  DISCUSSION

### A. Count II: First Amendment Retaliation against Westfall

Moschetti alleges that Westfall retaliated against her for sharing the VLM Report with individuals and organizations outside OSIG in violation of the First Amendment. To state a viable First Amendment retaliation claim, Moschetti must show three elements. *Massaro v. Fairfax Cnty.*, 95 F.4th 895, 905 (4th Cir. 2024) (citing *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998)).  First, she must show that she "spoke as a citizen on a matter of public concern, rather than as an employee on a matter of personal interest." *Id.* Second, that her interest "in [her] expression outweighed the employer's 'interest in providing effective and efficient services to the public.'" *Id.* (quoting *McVey*, 157 F.3d at 277–78).  Third, that her speech "was a 'substantial factor' in the adverse employment action." *Id.*

Moschetti provided VLM Report drafts and other investigative materials to four groups of individuals: (1) Detective Marley Williams; (2) Keith and Mindy Applewhite; (3) the Federal Bureau of Investigation; and (4) the Virginia General Assembly. Moschetti's contacts with the FBI were with the authorization of OSIG and neither party appears to claim that contact played a role in her termination.  And of the remaining three disclosures, Moschetti's disclosure to the General Assembly, an "appropriate authority" under the Whistleblower Protection Act ("WPA"), Virginia Code § 2.2-3011, is the most defensible.  Thus, the gravamen of the case is Moschetti's contact with the General

Assembly and whether Moschetti can show that her disclosure to the General Assembly caused her termination.

### i. Matter of Public Concern

For the purpose of a First Amendment Retaliation claim, a matter of public concern must be "an issue of social, political, or other interest to a community." *Urofsky v. Gilmore*, 216 F.3d 401, 406–07 (4th Cir. 2000) (en banc).  What is insufficient are "personal complaints and grievances about conditions of employment." *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007).  To determine whether the plaintiff's speech constitutes a matter of public concern, courts review "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

Westfall argues that when Moschetti leaked the VLM Report drafts, she was speaking as a self-interested employee and not as a private citizen on a matter of public concern.  Moschetti consistently maintained that she was "never motivated to speak to the media or give anything to the media." (Moschetti Dep. at 141:4–142:2.)  And while Westfall concedes the VLM Report was of public concern, he argues that Moschetti provided the VLM Report to the General Assembly out of self-preservation—attempting to cover up and avoid discipline for her policy violations of already leaking information to Detective Williams and the Applewhites.  (Westfall Mem. in Supp. at 24.)  Accordingly, Westfall contends that "while the overall content of Moschetti's disclosures involve matters of public concern, the form and context of her disclosures confirm they

were based on her 'immediate self-interest, [which] is not a matter of public concern and therefore not protected by the First Amendment.'" (*Id.*)

Conversely, Moschetti argues that she spoke on a matter of public concern as a private citizen. Specifically, she (1) spoke about the malfeasance of the Virginia Parole Board and the minimization of that malfeasance by OSIG and the Governor's Office (the content); (2) used outside avenues (including speaking to law enforcement officials and the General Assembly), (3) did not use an internal grievance process (the form); and (4) performed the actions in the context of the overall public discussion in Virginia about the Virginia Parole Board scandal, not just to advance her own personal interests (the context). (Moschetti Opp'n to Westfall at 17.) Moschetti also argues that, at the very least, there is a genuine dispute as to whether she was speaking as a private citizen or public employee. (*Id.* at 19.) Because Moschetti disclosed the VLM Report to entities or individuals outside of her chain of command, she could not have been speaking as an employee. (*Id.*) "[T]he mere fact that she learned information about governmental misconduct as part of her job duties does not mean that her separate speech exposing governmental misconduct was part of her official duties." (*Id.* at 20.) Finally, even if Moschetti was self-interested, she argues "mixed speech" is still conferred First Amendment protection. (*Id.* at 21.)

The Court finds that if Moschetti were to proceed to trial, a reasonable juror could conclude she spoke as a private citizen on a matter of public concern. Both the final VLM Report and Moschetti's fourteen (14) page draft of the VLM Report garnered

11

widespread public attention. This attention was drawn from the public's interest in not only the parole release of Martin, but also the scandals plaguing the Parole Board in general, which included the misconduct and subsequent resignation of Parole Board Chair Bennett. (Pl.'s SUF ¶ 2.) While Moschetti admitted that she was not motivated to speak to news outlets, the context of this admission nonetheless reflects her view that OSIG was sanitizing the VLM Report, and she shared the Report with others because she felt that those in charge were covering up misconduct. Finally, Moschetti went outside of her chain of command—reasonably since the she believed Westfall might be complicit in the cover-up—and shared the VLM Report with current and former law enforcement, and ultimately the Virginia General Assembly. This alone, however, is not enough to sustain a First Amendment retaliation claim since the Constitution permits organizations to impose limits on employees' speech in certain circumstances.

### ii. Interest in Providing Effective and Efficient Services

An employer's interest in providing effective and efficient services to the public can outweigh a government employee's interest in free public expression. *See Massaro*, 95 F.4th at 905. In *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the United States Supreme Court adopted a balancing test when assessing an employer's and employee's interests. Under this test, the Court considers

> whether [Moschetti's] speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of [her] duties; (5) interfered with the operation of [OSIG]; (6) undermined the mission of [OSIG]; (7) was communicated to the public or coworkers in private; (8) conflicted with [Moschetti] responsibilities within [OSIG]; and (9) abused

12

the authority and public accountability that [Moschetti's] role entailed.

*Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir. 2006) (citing

*McVey*, 157 F.3d at 278); *see also Pickering*, 391 U.S. at 573.  Westfall argues these

factors heavily weigh against Moschetti.

Ultimately, Westfall contends the leak undermined the public's trust in

government and resulted in the effectiveness of OSIG's investigations being questioned.

(Westfall Mem. in Supp. at 26.)  Westfall also argues that Moschetti's breach of

confidentiality regarding sensitive information has made it more difficult for OSIG to

function and cooperate with other agencies, who now have concerns over sharing

confidential information.  (*Id.*)  Moreover, in response to Moschetti's leaks, the General

Assembly passed legislation authorizing an independent investigation of OSIG's

investigation and the subsequent Governor followed with a separate AG investigation

into the matter, demonstrating the immense concerns over OSIG's investigative

capabilities in the wake of Moschetti's leaks.  (*Id.*)  Westfall also states that Moschetti

abused her authority and the public accountability entailed by her role as a confidential

investigator by collecting highly sensitive and confidential materials gathered from

OSIG's investigation and then transmitting them to Ms. Applewhite and her husband.

(*Id.*)  Finally, Moschetti's position as an OSIG investigator is particularly the type of

confidential role that should enjoy less First Amendment protection than most other

public employees.  (*Id.* at 27.)

On the other hand, Moschetti argues that Westfall stated in his deposition that

Moschetti's disclosure has not impaired any investigations.[6] (Moschetti Opp'n to Westfall at 23.) While Moschetti concedes she revealed confidential information which she was not supposed to do, she contends the information was so extraordinary and shocking that the *Pickering* factors weigh in favor of her. (*Id.*)

The Fourth Circuit does "not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (quoting *Jurgensen v. Fairfax Cnty.*, 745 F.2d 868, 879 (4th Cir. 1984)). Moreover, "a public employee, who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower-level employee." *McVey*, 157 F.3d at 278.

OSIG's mission is to investigate "fraud, waste, abuse or corruption." Va. Code § 2.2-309. Accordingly, the agency has a strong interest in maintaining its reputation for integrity and confidentiality. During Moschetti's short tenure at OSIG, she executed four separate agreements attesting to the importance of confidentiality within OSIG. (Westfall SUF ¶ 8.) After the leak, Louden and Westfall both testified how the reputation of OSIG suffered from her conduct—particularly since the Office was a relatively new agency.

---

[6] Westfall explained that initially there were concerns and "questions" by other agencies "which delayed some things but . . . ultimately, all [of OSIG's] investigations were completed." (Westfall Dep. at 94:24–95:2.) Yet, Moschetti's conduct, according to Westfall, has increased the administrative burden due to her unauthorized recording and leaking of the August 14, 2020 meeting. (*Id.* at 96:6–25.)

(Westfall Dep. 120:14–121:2, 122:15–131:5; ECF No. 103-4; Grievance Hearing, Louden Tr. at 106:2–22, ECF No. 113.)  Moreover, OSIG is also precisely the sort of organization that may impose stricter restrictions on its employees' First Amendment protections. *See McVey*, 157 F.3d at 278; *see also Billioni v. Bryant*, 998 F.3d 572, 577–78 (4th Cir. 2021) (holding *Pickering* balancing weighed against law enforcement plaintiff who shared confidential information); *Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016) ("[P]olice officials are entitled to impose more restrictions on speech than other public employers because a police force is 'paramilitary'—discipline is demanded, and freedom must be correspondingly denied."). As the "watchdog" agency in Virginia, OSIG has a stronger interest in maintaining discipline than even a normal law enforcement agency. (*See also* Grievance Hearing, Louden Tr. at 106:15–22 ("But, again, we hold our employees to a much higher standard than any other state agency that I've [Louden] been with or worked with . . . .")

Consequently, Moschetti's interest in disclosing confidential information to Detective Williams and the Applewhites is outweighed by OSIG's interest in providing effective and efficient services. *See Ridpath*, 447 F.3d at 318. The evidence shows that her disclosures damaged the relationships between OSIG and other entities and interfered with OSIG's operations, as other agencies began to question the effectiveness of OSIG's ability to maintain confidentiality and conduct investigations. Furthermore, her actions undermined the mission of OSIG to investigate corruption and prepare reports as prescribed by statute. *See* Va. Code § 2.2-309. Moschetti's conduct directly conflicted

15

with her responsibilities within OSIG to maintain confidentiality and she ultimately abused the authority that her role entailed. Indeed, Moschetti is precisely the sort of rogue employee that OSIG legitimately fears, who, needlessly, goes outside the legal processes to "rush to try their [peers] in the court of public opinion." *Billioni*, 998 F.3d at 578 (quoting *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 589 (4th Cir. 2017) (Motz, J., concurring)). [7]

On the other hand, OSIG's interests cannot reasonably outweigh legitimate whistleblower activity under the WPA. Virginia's WPA identifies several entities Moschetti could have reached out to, including federal agencies, the Office of the Attorney General, and the General Assembly. Va. Code § 2.2-3010. Thus, where OSIG's interests are hampered by rogue disclosures to inappropriate authorities, as an "appropriate authority" under the WPA, the General Assembly is precisely the sort of entity contemplated by Virginia law to receive disclosures *without* impairing or impeding the function of OSIG.

Therefore, while OSIG's interests in preventing employees from leaking confidential information to third parties not listed in the WPA outweigh some of Moschetti's conduct, her disclosure to the General Assembly could be sufficient to establish a claim for First Amendment retaliation so long as she can show her speech was

---

[7] Even if the *Pickering* factors weighed more in Moschetti's favor, Westfall would be entitled to qualified immunity because it is not clearly established that the factors would favor an employee over an organization akin to OSIG. *See Brickey*, 828 F.3d at 304 (holding qualified immunity was warranted when balancing of the employee's and employer's interests were not clearly established).

a substantial factor in her termination.

### iii. Substantial Factor in Adverse Employment Action

Finally, Westfall argues that Moschetti cannot show that her disclosure to the General Assembly was a substantial factor in her termination. (Westfall Mem. in Supp. at 28.) By the time Moschetti disclosed the VLM Report to the General Assembly, she had already broken her confidentiality and violated twenty-five (25) OSIG policies related to transmitting confidential information from her agency email to her personal email. (*Id.*; Ex B.) Furthermore, during her deposition, Moschetti admitted "Yes," when asked, "Do you believe you still would have been terminated if you hadn't disclosed that information to the General Assembly?" (Moschetti Dep. at 255:15-18.)

Moschetti disputes her admission and argues that there is a genuine dispute as to causation. (Moschetti Opp'n to Westfall at 24.) First, she disputes her deposition testimony. While Westfall accurately quotes her response, later in the deposition, when asked by her own attorney, she equivocated and agreed to her counsel's question that she believed but for her disclosure to the General Assembly OSIG would not have terminated her. (Moschetti Dep. at 335:7–13, ECF No. 103-16.)[8] Second, Moschetti points out that Deputy Inspector General Louden admitted that Moschetti's communication to the General Assembly "got the ball rolling" in terms of the OISG's decision to discipline and fire her. (Moschetti's Opp'n to Westfall at 14 (citing Grievance Hearing, Louden Tr. at

---

[8] Moschetti was asked, "Do you believe if by this time on March 17, 2021, if you had not come forward and identified yourself as the whistleblower, that they wouldn't have gone forward with this investigation the way they did and gone for termination?"

104:20–105:11).)  Finally, the "temporal proximity between the leaks to the media and

the General Assembly disclosures, on the one hand, and the termination decision, on the

other, create a clear circumstantial connection between Moschetti's protected activities

and her termination."  (Moschetti's Opp'n to Westfall at 14.)

Moschetti bears the initial burden to show that her "protected expression was a

'substantial' or 'motivating' factor in [OSIG's] decision to terminate" her.  *Wagner v.*

*Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v.*

*Doyle*, 429 U.S. 274, 287 (1977)).  Only after making that initial showing does the

burden shift to Westfall to show that OSIG would have terminated Moschetti "in the

absence of the protected expression, more simply, the protected speech was not the but

for cause of the termination."  *Wagner*, 13 F.3d at 90.

At the motion to dismiss juncture, the Court was hesitant to conclude that

Moschetti's disclosure to the General Assembly was not a substantial or motivating factor

in OSIG's termination of her, but no longer.  The Court now concludes Moschetti cannot

prove that her disclosure to the General Assembly was a substantial factor in her

termination.

Moschetti was formally fired for twenty-five (25) separate violations of OSIG

policy.  The violations related to Moschetti's decision to email confidential information

from her OSIG email account to her personal email account between May 4, 2020, and

January 11, 2021.  (Ex. 16 to Moschetti Dep., Notice of Process, ECF No. 98-3 at 71–

74.)[9]  The four separate confidentiality statements Moschetti agreed to were very clear that violations of the confidentiality agreements "may result in disciplinary action, up to and including, [her] termination of employment." (Ex. 2 to Moschetti Dep., Employee Work Profile, ECF No. 98-3 at 61; *see also* Ex. 5 to Moschetti Dep., NDA, ECF No. 98-3 at 63–64; Ex. 6 to Moschetti Dep., NDA, ECF No. 98-3 at 64–65; Ex. 7 to Moschetti Dep., NDA, ECF No. 98-3 at 67–68; Moschetti Dep. at 95:14–15, 100:5–101:8)

Against this backdrop, Moschetti still contends that Louden's statements and the circumstantial connections adequately show that the termination based on her twenty-five (25) violations was simply pretextual, and a reasonable jury could find she was actually fired for her protected speech.  This contravenes the factual record.

The 14-page VLM Report was leaked to the news media in February 2021.  That same month, OSIG announced their investigation into the leak alongside VSP's investigation.  (Pl.'s SUF ¶ 47; Westfall SUF ¶ 36.[10])  The next month, *after* this announcement, Moschetti transmitted drafts of the VLM Report and other confidential information to the Virginia General Assembly, and OSIG learned an anonymous whistleblower had shared information to the General Assembly—but not yet that

---

[9]  The Court refers to the ECF pagination because the exhibits within Exhibit 3 are those presented to Moschetti during her deposition.

[10]  While neither Westfall not Louden provide a specific date the investigation began, media outlets were reporting as early as February 25, 2021, that OSIG was investigating and "taking appropriate action to identify the person(s) responsible for improperly disclosing such information." (Westfall SUF ¶ 35 n.6.)  Testimony from Louden during the Grievance Hearing suggests OSIG and VSP began investigating beginning on or around February 24, 2021. (*See* Grievance Hearing, Louden Tr. at 73:1–7.)

Moschetti was the anonymous individual. (*Id.* ¶ 49.) By March 5, 2021, OSIG was able to narrow its ongoing investigation to Moschetti and accordingly made the decision to place Moschetti on pre-disciplinary leave. (Grievance Hearing, Louden Tr. at 146:4–147:8.) That same day, *after being placed on pre-disciplinary leave*, Moschetti, through counsel, contacted OSIG, identifying herself as the anonymous whistleblower. (Pl.'s SUF ¶ 46–47; Westfall SUF ¶ 40.) This timeline alone is very persuasive and provides context for Louden's statements on the General Assembly disclosure.

During Moschetti's Grievance Hearing, Louden was asked whether Moschetti's communication to the General Assembly was the basis for her disciplinary action. Louden responded, "The basis? I mean it got the ball rolling, because they provided us with the support we needed. *But, no,* I mean the basis was her sharing [the reports and information] to her personal E-mail. . . . The grounds [were] sharing of confidential sensitive information, including what had been entrusted to us by other agencies, outside of the commonwealth of Virginia secure network." (Grievance Hearing, Louden Tr. at 104:17–105:11 (emphasis added).) Furthermore, Louden noted that the leak to the news media could not have been the basis for disciplining Moschetti because at that time OSIG and Louden "[didn't] know who actually literally gave things to the press." (Louden 201:16–18.)

During the Grievance Hearing, Louden consistently testified that Moschetti's termination was based on her violations of OSIG policy, and Moschetti neither contests that she violated OSIG policy nor that these policies permitted termination for precisely

Moschetti's kind of conduct, i.e., sharing confidential information outside of Virgina's

secure network.  Finally, both Moschetti's admission and subsequent equivocation for

what she believed was the basis for her termination are ultimately of little, if any,

probative value.  Since her testimony amounts to an opinion that is not supported by any

particular fact or facts for which she has any personal knowledge, it is insufficient to

preclude summary judgment.[11]  *See Holland*, 487 F.3d at 214 ("If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." (quoting

*Anderson*, 477 U.S. at 249–50)).

At trial, jurors would be presented with undisputed evidence that OSIG began and

announced its investigation *before* Moschetti's disclosure to the General Assembly and

that OSIG identified Moschetti as having violated OSIG policy and placed her on pre-

disciplinary leave *before* Moschetti identified herself as the putative whistleblower.

While the Court views this evidence in the light most favorable to the nonmoving party

and draws all reasonable inferences in her favor, Moschetti must direct the Court to

evidence that could lead a reasonable jury to find in her favor.  *Dean v. Jones*, 984 F.3d

295, 301 (4th Cir. 2021).  Moschetti's speculative declarations and testimony is "not

significantly probative" to preclude summary judgment.  Consequently, no reasonable

juror could find that Moschetti carried her initial burden under *Mt. Healthy*, nor that her

---

[11] Her ultimate opinion as to the reason for her firing would also likely be inadmissible at trial since it is simply speculative. *See Whittaker v. Morgan State Univ.*, 524 F. App'x 58, 60 (4th Cir. 2013) ("[A] party's reliance on that material may be defeated if 'the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" quoting Fed. R. Civ. P. 65(c)(2)); *see also* Fed. R. Evid. 602 (requiring personal knowledge); Fed. R. Evid. 701 (requiring opinions to be based on the witness's perception and helpful to the jury).

disclosure to the General Assembly was the "but for cause" of her termination, and accordingly, Count II will be dismissed with prejudice.[12]

### B. Count III: Wrongful Termination against Westfall

In Count III, Moschetti claims that Westfall wrongfully terminated her in violation of the Whistleblower Protection Act, Virginia Code § 2.2-3011. (Am. Compl. ¶¶ 76–84.) The WPA prohibits retaliation against "a whistle blower whether acting on [her] own or through a person acting on [her] behalf under [her] direction." Va. Code § 2.2-3011(A). Notwithstanding this prohibition, the WPA also states, "Nothing in this chapter shall prohibit an employer from disciplining or discharging a whistle blower for his misconduct or any violation of criminal law." Va. Code § 2.2-3011(E).

Because the statute still permits disciplining or discharging for misconduct, Westfall contends that Moschetti's conduct of disclosing information to unauthorized individuals means she cannot claim whistleblower status. (Westfall Mem. in Supp. at 30.) Additionally, Westfall also argues that Moschetti litigated this very claim—i.e., her whistleblower status—in her underlying Grievance Hearing, and the court there denied her claim. (ECF No. 70-10.) While the Court declined to dismiss it under 12(b)(6) because the Richmond Circuit Court at that time could have reversed the hearing officer, the Circuit Court has since affirmed the hearing officer's decision.[13]  (*Id.*)  At summary

---

[12] As the Court already discussed, Moschetti's other disclosures fail on the second prong and thus causation for them need not be reached. *See supra* Section III.A.ii.

[13]  However, after the Grievance Hearing was affirmed by the Richmond Circuit Court, this Court denied Westfall's Motion to Strike Count III because Westfall lacked privity and mutuality in the hearing to assert collateral estoppel. (Mem. Op. at 14–16, ECF No. 84.)

judgment, the Court may consider the decision as evidence, though it continues to lack any actual preclusive effect.  Finally, Westfall argues that even apart from the hearing, the evidence in the record is sufficient to satisfy summary judgment.

Moschetti counters that because she disclosured materials to the General Assembly, an "appropriate authority" under the WPA, whether she was fired for that disclosure rather than her other disclosures, or twenty-five (25) policy violations, is a genuine issue of material fact.  (Moschetti's Opp'n to Westfall at 25.)

Moschetti's argument fails for the same reasons as her First Amendment retaliation claim on the causation issue.  Moschetti failed to present evidence that would permit a reasonable jury to find OSIG fired her for constitutionally protected speech—which under the WPA can only include Moschetti's disclosure to the General Assembly.  *See supra* Section III.A.iii.  Moreover, even if Moschetti had shown that her termination was motivated in part by her disclosure to the General Assembly, that showing would not preclude judgment against her based on Virginia Code § 2.2-3011(E).  The statute explicitly states "*nothing in this chapter* shall prohibit an employer from disciplining or discharging a whistleblower for his misconduct or any violation of criminal law."  Va. Code § 2.2-3011(E).  That language shows that the exclusive reason for firing Moschetti must be to retaliate against her whistleblowing.  *Id.*  Accordingly, since Moschetti violated twenty-five (25) separate OSIG policies, she cannot claim protection under the WPA, *even if* OSIG was partially motivated by her disclosure to the General Assembly.  Accordingly, Count III will be dismissed with prejudice.

23

### C. Count VI: Defamation against Mercer

To support a defamation claim, Moschetti must present evidence of "1) publication 2) of an actionable statement, 3) with the requisite intent." *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015). Whether a statement is actionable as defamation is a question of law that is decided by the Court. *Gilberston v. Jones*, No. 3:16-cv-255, 2016 WL44533, at *6 (E.D. Va. Aug. 17, 2016) (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). "[S]tatements of opinion" are not actionable as defamation "because such statements cannot be objectively characterized as true or false." *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005).

Mercer argues that each of his statements were not directed at Moschetti and that they constituted opinion and are therefore not actionable. (Mercer Mem. in Supp. at 21, ECF No. 100.) First, Mercer's comments were directed specifically at the VLM Report, not Moschetti herself. The VLM Report was signed by Westfall as the State Inspector General—not Moschetti—thus, Mercer's comments cannot be attributed to Moschetti in the first place. (*Id.*) Even if they were to be attributed to her, Mercer argues that expressions regarding bias and objectivity are clearly opinions. (*Id.* at 21–23.) During his deposition, Mercer repeatedly characterized his comments as his opinion, and he asserts that a reasonable listener would also understand them to be opinions. Mercer also argues that Moschetti is a limited-purpose public figure and thus she fails to prove the requisite intent—malice. (Mercer Reply at 12, ECF No. 109.)

On the other hand, Moschetti argues that Mercer's statements are still actionable, even if they are opinion, because they "imply an assertion of fact." *Schaecher*, 772 S.E.2d at 595. Looking at the statements with context, Moschetti posits that Mercer's statements were laden with factual content and implied that Mercer had more knowledge about his claims than he was letting on. (Moschetti Opp'n to Mercer at 3.) Accordingly, a reasonable listener could have understood the opinion to be based on Mercer's knowledge of undisclosed facts. (*Id.* at 4.) Moschetti also contends that in the context of Mercer's statements, a reasonable listener would have understood his comments as directed toward Moschetti. The previous day, she had initiated her lawsuit and there was a lot of news media discussion around her as a whistleblower and author of the report. (*Id.* at 5–6.)

Mercer's alleged defamatory statements during a press conference were (1) "We went into that meeting thinking that there was bias and there was lack of objectivity;" and (2) "We left that meeting knowing that there was bias and a lack of objectivity in that report." (Am. Compl. ¶ 51.) These comments came in direct response to a question asked by a reporter during the press conference.[14] (Moschetti Dep. at 276:16–18.) In assessing Mercer's statements, the Court need only look to the "ordinary and common" meanings of the words, *Webb v. Virginia-Pilot Media Cos.*, 752 S.E.2d 808, 811 (Va.

---

[14] It is important to note, again, however, that Moschetti has not produced any recording or transcript of the press conference and the Court has no evidence before it—other than Moschetti's testimony—that the statements were ever said. Mercer, himself, does not precisely remember what he said, but he believed that Moschetti's memory of his statements was "generally accurate." (Mercer Dep. at 60:21–61:7.)

2014), though the defamatory meaning "may be made by inference, implication, or insinuation." *Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 592 (Va. 1954); *see also Snyder v. Phelps*, 580 F.3d 206, 219 (4th Cir. 2009) ("[W]e are obliged to assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message."), *aff'd*, 562 U.S. 443 (2011).

The context of Mercer's statements establishes how a reasonable listener would have interpreted his language. Mercer's statements were in his capacity as Chief of Staff to Governor Northam and in response to direct questions by a member of the press. (Mercer SUF ¶ 37.) Included in his response was a statement—that the Court previously held was opinion—that Moschetti's claims were "a political ploy to hurt the Northam administration and other state leaders." (Mem. Op. at 31–32, ECF No. 32; Am. Compl. ¶ 52.) This context shows that a reasonable listener would have understood Mercer's statements as his own opinion. While they might have understood that opinion to be informed by Mercer's background and experience with Moschetti, as all opinions are laden with such knowledge, Mercer's statements cannot not rise to the level of "imply[ing] an assertion of fact." *Schaecher*, 772 S.E.2d at 595. Indeed, even Moschetti admitted that the statements were Mercer's opinion—despite this opinion being one Moschetti disagreed with. (Moschetti Dep. at 277:18–279:16.) The plain language of the statements supports this same conclusion.

Mercer stated "We went into that meeting thinking . . . [and] [w]e left that meeting

knowing . . . ." While couching a statement with "we" does not automatically defeat a defamation claim, the use of these pronouns suggests a personal viewpoint—that Mercer and others in the Northam Administration were skeptical of the VLM Report from the very beginning. Accordingly, any reasonable listener would have understood Mercer to be saying that he personally believed the report was biased and lacked vital information, and the August meeting reinforced his opinion about the report.

Moreover, the context demonstrates Mercer's statements are constitutionally protected by the First Amendment. *Snyder*, 580 F.3d at 219. Mercer's statements, during a press conference and in response to a question from the press, are the epitome of matters of public concern. *See id.* As Moschetti readily admits, her conduct and the VLM Report were being widely discussed. Thus, in order to overcome this protection, Moschetti must show that the statements were "made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). In defense of the validity of the VLM Report, Moschetti presents a report conducted by Attorney General Jason Miyares (the "Miyares Report"). This report supports Moschetti's assertion that her report was *not* biased as a factual matter, but it does not support any inference that Mercer spoke with full knowledge of the false implication of his speech, months before any report existed. Accordingly, Moschetti presents no evidence that could lend a reasonable juror to find that Mercer defamed Moschetti and the claim will be dismissed with prejudice.

27

### D. Count VI: Defamation against Moran

Moschetti alleges Moran made several defamatory statements during his appearance on the John Reid Show.  However, Moschetti willingly admitted she did not listen to the recording live and only found out about it—and listened to it—after the fact. (Moschetti Dep. at 263:7–267:22.)  Nonetheless, the recording of Moran's appearance on the John Reid Show was not produced during discovery and Moschetti submits to the Court simply her own memory of the recording from over three years ago.  At this juncture, the Court accepts that Moran stated that Moschetti would not hold up under "cross-examination" and stated Moschetti or the VLM Report was "bias" or lacked "integrity."

Moschetti again contends that Moran's statements, even if opinions, carried an innuendo that implied an assertion of fact.  (Moschetti Opp'n to Mercer at 6.)  The Court disagrees because, like Mercer's statements, Moran's statements also simply constitute his opinion and are protected by the First Amendment.  Statements of bias and integrity may have factual components, as all opinions do, but they are reasonably understood to be the perspective of an individual.  Furthermore, just as members of the jury would each form their own opinions about whether Moschetti's statements held up on cross-examination if the case were to proceed to trial, Moran's alleged statements are those quintessential of opinion.  While more context could prove differently, Moschetti has failed to produce any context that would prove these statements could reasonably be interpreted as anything but the opinion of Moran.

28

Moran spoke on the John Reid Show in his capacity as the Secretary of Public Safety and Homeland Security, as he often did to give COVID-19 updates. As with Mercer, Moschetti and the VLM Report were a matter of public concern. Moreover, Moran's statements, particularly whether Moschetti could hold up on cross-examination, are textbook examples of "loose, figurative, or hyperbolic language" and statements that do not contain a provably false connotation. *See Synder*, 580 F.3d at 219. Consequently, Mercer also enjoys First Amendment protection for this speech.

Accordingly, no reasonable juror could find that Moran defamed Moschetti on the John Reid Show. Consequently, Count VI against Mercer and Moran will be dismissed.

## IV.   CONCLUSION

The Court thus holds that there is no genuine dispute as to any material fact and the Defendants are entitled to judgment as a matter of law. In short, Moschetti's evidence for her retaliation claims consists of almost entirely her own testimony about why she believes Westfall terminated her and a statement from Louden that in its context simply does not support her claim. Moreover, Moschetti has failed to produce any evidence to support her defamation claims; instead, the evidence is clear that a reasonable listener would conclude Mercer and Moran's statements amount to nothing more than their opinions. Therefore, for the foregoing reasons, the Court will grant Defendants' Motions for Summary Judgment (ECF Nos. 97, 99). Additionally, by motion of Defendants (ECF No. 115), and finding it appropriate, the Court will deem Defendants' Motion for Spoilation and Discovery Sanctions (ECF No. 95) as withdrawn.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: **November 26, 2024**
Richmond, Virginia